Herman M. Hale and Louberta M. Hale, et al. [1] v. Commissioner. Hale v. Commissioner
Docket Nos. 1395-63, 1396-63, 1401-63, 1403-63.
United States Tax Court
T.C. Memo 1965-274; 1965 Tax Ct. Memo LEXIS 56; 24 T.C.M. (CCH) 1497; T.C.M. (RIA) 65274; October 13, 1965
Paul Wyler, for the petitioners in Docket Nos. 1395-63 and 1396-63. Gilbert Dreyfuss and Douglas W. Argue, for the petitioners in Docket Nos. 1401-63, 1402-63 and 1403-63. Paul G. Wilson, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the income tax of petitioners in the years and in the amounts as follows: Docket No.
Year
Deficiency
1395-63
1956
$13,748.02
1957
3,851.07
1958
3,562.07
1396-63
1956
13,768.24
1957
3,815.47
1958
3,906.25
1401-63
1956
868.78
1957
620.25
1958
1,264.39
1402-63
1956
896.47
1957
602.18
1958
1,283.17
1403-63
1956
912.63
1957
576.10
1958
1,132.10
The parties have *60 disposed of certain issues raised in the pleadings. The remaining issues for decision are: 1. Were the earnings of The Walnut Company, Ltd., attributable, in their entirety, to The Hale Company as ordinary income during each of the taxable years in issue? In the alternative, did the transaction between The Hale Company and D-K Investment Corporation result in the sale by the former of unrealized receivables to the latter in 1956? 2. Did The Hale Company realize ordinary income, rather than capital gain, from the sale of certain realty during each year in issue? (a) Are the petitioners in Docket Nos. 1395-63 and 1396-63 entitled to capital loss carryover deductions in 1956 by reason of an alleged loss realized on the sale of certain land in 1955? (b) Did petitioners in Docket Nos. 1395-63 and 1396-63 realize ordinary income to the extent of profits aggregated on a note which they received as a part of their distributive share of profits realized in 1957 upon the sale of certain partnership property of The Hale Company? 3. Are each of petitioners in Docket Nos. 1395-63 and 1396-63 entitled to deduct $1,000 in each year in issue for alleged entertainment expenses? 4. Did the *61 distribution of certain property by The Hale Company to Godbey Trenching Company in 1958 upon the withdrawal of the latter from the former partnership result in the receipt by petitioners in Docket Nos. 1401-63, 1402-63 and 1403-63 of ordinary income in the amount of $7,192.56? 5. Are petitioners in Docket Nos. 1395-63 and 1396-63 entitled to deductions in 1957 and 1958 for payments made by The Hale Company to two withdrawing partners? Findings of Fact Some of the facts have been stipulated, and they are so found. Facts in General Petitioners in each case, Herbert M. and Louberta M. Hale; Samuel J. and Lillian Berland; William H. and Vivian A. Godbey; Charles L. and Geraldine L. Godbey; and Dexter L. and Iva F. Godbey, are husband and wife, all residing in California. They timely filed their respective joint Federal income tax returns for the taxable years 1956, 1957, and 1958 with the district director of internal revenue, Los Angeles, California. On March 26, 1953, Samuel J. Berland and Herman M. Hale, together with Silvia Lardner and Carter Darnell, became general partners and R. M. Tillis became a limited partner in The Hale Company (hereinafter referred to as Hale *62 Co.), a limited partnership formed under the laws of the State of California in 1953. On March 27, 1953, Hale Co. filed with the County Clerk of Orange County, California, a certificate of limited partnership and duly had recorded a copy of the said certificate with the County Recorder of Orange County. On December 14, 1953, Godbey Trenching Company (hereinafter referred to as Trenching Co.), a general partnership composed of Dexter L. Godbey, Charles L. Godbey, and William Godbey, was admitted as a limited partner into Hale Co. Accordingly, an amended partnership agreement was executed in furtherance of the admission of Trenching Co. to Hale Co. as aforesaid. On December 17, 1953, Hale Co. filed with the County Clerk of Orange County an amendment to the certificate of limited partnership reflecting said amendment of December 14, 1953. Facts as to Issue 1 On or about March 18, 1954, Hale Co. entered into a contract to purchase certain land (hereinafter referred to as the Story property). On July 14, 1954, the said purchase was completed and the land deeded to Hale Co. On June 18, 1954, a limited partnership, The Walnut Company, Ltd., (hereinafter referred to as Walnut Co. *63 ) was formed. The original partners of Walnut Co. were Hale Co. (as general partner), and D. L. Godbey & Sons Construction Co., Inc., and Raymond Arenson (as limited partners). A certificate of limited partnership of Walnut Co., reflected the partnership agreement which was entered into on June 18, 1954, between the above-said individuals and entities. There was duly filed with the County Clerk of Orange County a copy of said certificate of limited partnership. Walnut Co. was formed for the purpose of acquiring and improving the Story property and constructing or causing to be constructed dwelling units thereon and selling the dwelling units thus created. Walnut Co.'s partnership agreement of June 18, 1954, provided that the term of said partnership's existence was to be until the completion of the subdivision and improvement thereof, and construction of dwelling units on the Story property, and the sale of said dwelling units, or until two years from the date of said agreement, whichever occurred first. The above-said partnership agreement of June 18, 1954, of Walnut Co. provided that the limited partners were to contribute solely cash to the said partnership, in return for which *64 they would receive the first net profits of the said partnership until all of the limited partners had received, in addition to the return of the cash contributions, a sum equal to 50 percent of their cash contributions to capital. All remaining net profits of Walnut Co. were to be paid to the general partner. Hale Co. received its partnership interest in Walnut Co. in exchange for its contribution of services, past and future, thereto. During the years in issue, Hale Co. performed the administrative, clerical, and managerial work for Walnut Co. The first losses, if any, of Walnut Co. were to be borne by the limited partners to the extent of their contributions to Walnut Co.'s capital. Any losses in excess thereof were to be borne by the general partner alone, and the limited partners were not liable for any of such losses. On July 14, 1954, Hale Co. deeded the Story property to Walnut Co. On September 15, 1954, Walnut Co.'s partnership agreement of June 18, 1954, was amended to provide for the substitution of Dexter L. Godbey, Charles L. Godbey, and William H. Godbey in place of D. L. Godbey & Sons Construction Co., Inc., as limited partners in Walnut Co. and to provide for *65 the admission of George Rapport, William R. Bidner, Max Myers, and Bernie Bernstein as limited partners in Walnut Co., and the said partners of Walnut Co. executed an amended certificate of limited partnership of Walnut Co. and duly filed a copy thereof with the County Clerk of Orange County. The articles of incorporation of D-K Investment Corporation (hereinafter referred to as D-K) were filed with the Secretary of State of California on April 9, 1955. D-K was organized in 1955 by Gilbert Dreyfuss (hereinafter referred to as Dreyfuss) and Irving Kaufman (hereinafter referred to as Kaufman), from whom it had derived its name. Kaufman, the president of D-K throughout the years in issue and initially a 50-percent stockholder therein, had been Hale Co.'s accountant from its inception in 1953 to and throughout all of the years involved. He also served as Walnut Co.'s accountant for the years in issue. Dreyfuss represents petitioners in Docket Nos. 1401-63, 1402-63 and 1403-63 in this proceeding. D-K was capitalized and the stock thereof purchased and issued in the following manner: 1. On April 8, 1955, Isidore Herman (Dreyfuss' father-in-law) loaned $10,000 to D-K; 2. On December 3, 1955, Herman *66 issued a check to Kaufman, drawn in the amount of $5,000, as a loan which was used by Kaufman to buy 50 shares of D-K stock; on the same date, Herman issued a check to D-K drawn in the amount of $5,000 in payment for 50 shares of D-K stock to be issued to him; 3. On December 6, 1955, 50 shares of D-K stock were issued to Kaufman and 50 shares were issued to Herman; 4. On December 9, 1955, D-K repaid Herman the $10,000 which it had borrowed from him on April 8, 1955; 5. On July 26, 1956, Kaufman transferred his said 50 shares of D-K stock to Herman; 6. On September 6, 1956, a new certificate was accordingly issued to Herman for the above-said shares of stock transferred to him by Kaufman; and 7. On September 10, 1956, Herman received from Kaufman $180.55 as interest on the $5,000 loan which he had made to Kaufman on December 3, 1955. On April 9, 1955, Hale Co. and D-K executed an agreement negotiated by Dreyfuss which provided that Hale Co. would sell most of its partnership interest in Walnut Co. to D-K. On April 9, 1955, the Walnut Co.'s partnership agreement of June 18, 1954, as amended on September 15, 1954, was further amended to ratify the assignment by Hale Co. *67 of 90 percent of its partnership interest in Walnut Co., including 90 percent of its interest in Walnut Co.'s profits and 90 percent of its interest in Walnut Co.'s capital, to D-K and the admission of D-K as a general partner in Walnut Co. Said agreement of April 9, 1955, between Hale Co. and D-K provided that in consideration of the payment by D-K to Hale Co. of $125,000, Hale Co. would transfer to D-K 90 percent of Hale Co.'s partnership interest in Walnut Co., which interest expressly included 90 percent of Hale Co.'s interest in Walnut Co.'s profits and capital. The said agreement of April 9, 1955, between Hale Co. and D-K specified that payment of the $125,000 consideration by D-K was to be as follows: 1. $10,000 on April 9, 1955; 2. $50,000 on or before October 9, 1955; 3. $31,250 on or before January 9, 1956; and 4. $33,750 on or before April 9, 1956. Pursuant to the purchase by D-K of 90 percent of Hale Co.'s interest in Walnut Co., $10,000 was paid to Hale Co. on April 9, 1955. Following is a schedule showing the amounts and dates of the payments made by D-K to Hale Co. toward the purchase of said interest in Walnut Co. and a corresponding schedule showing the *68 amounts and dates of withdrawals by D-K from Walnut Co. Payments to Hale Co.
Date
Amount
10/10/55
$ 22,437.13
10/14/55
27,562.87
12/13/55
18,000.00
2/ 9/56
16,000.00
4/16/56
5,000.00
5/ 7/56
5,000.00
8/ 2/56
5,000.00
8/22/56
4,000.00
11/30/57
3,273.84
12/ 2/57
8,726.16
Totals
$115,000.00
Withdrawals from Hale Co.
10/10/55
$ 22,437.13
10/10/55
27,562.87
12/ 7/55
18,000.00
2/ 7/56
16,000.00
4/13/56
5,000.00
5/ 4/56
5,000.00
6/19/56
5,000.00
7/20/56
7,000.00
7/31/56
5,000.00
8/20/56
7,500.00
11/20/57
3,273.84
12/ 2/57
8,726.16
12/ 2/57
683.08
Totals
$131,182.08
In connection with its remaining 10 percent general partnership interest in Walnut Co., Hale Co. reported as its distributive share of partnership income of Walnut Co. the following amounts: Taxable year ended February 29, 1956
(After reduction by share of chari-
table contributions)
$12,301.24
Taxable year ended February 28, 1957
1,755.79
Taxable year ended February 28, 1958
None
Total
$14,057.03 Hale Co. received cash and property distributions from Walnut Co., as follows: Taxable year ended February 29, 1956
$ 9,333.33
Taxable year ended February 28, 1957
3,833.35
Taxable year ended February 28, 1958
1,409.22
Total
$14,575.90
*69 Hale Co., pursuant to an agreement which had been entered into on September 15, 1954, with Walnut Co., received from the latter $175 per house for services rendered as "general contractor" in connection with each house constructed on the land which had been deeded by Hale Co. to Walnut Co. on July 14, 1954. The adjusted basis to Walnut Co. of its inventory items, consisting of 111 houses and 3 lots, was in the amount of $1,286,333.68, exclusive of a basis adjustment of $5,188.74 attributable to Hale Co. The fair market value of the inventory items was in the amount of $1,484,550. As of April 9, 1955, 39 of the 111 houses were the subject of defeasible sales deposit agreements. [2] As of April 9, 1955, only 1 of the 39 houses had an executed escrow instruction. Walnut Co.'s selling agent, Walker & Lee, Inc., entered into a written agreement with Walnut Co. that all proposed purchasers are subject to approval of Walnut Co., the lending agency, the Veterans Administration, and the Federal Housing Administration. D-K realized *70 a net profit of approximately $6,300 from its partnership interest in Walnut Co. Since its purchase of an interest in Walnut Co., D-K has engaged in a number of business ventures, and has remained a viable entity. Opinion as to Issue 1 The first issue for decision involves the sale by Hale Co. of 90 percent of its partnership interest in Walnut Co. to D-K. Hale Co. received for its contribution of future services to Walnut Co. a right as a partner to participate in Walnut Co.'s future profits. [3] Hale Co. sold 90 percent of said right or interest to D-K before receiving any income from Walnut Co. [4] The question before us concerns the nature of the amount received on the sale. Petitioners argue that the gain received in the foregoing sale is a capital gain since (1) a right to share in income may constitute a partnership interest and (2) a partnership interest is generally a capital asset. There is, however, authority for the proposition *71 that a gain on the transfer of property technically qualifying as a capital asset (i.e., property) may be treated as ordinary income if it is in effect an anticipation of future income. See Hort v. Commissioner, 313 U.S. 28 (1941). We believe that this reasoning applies to deny capital gain treatment on Hale Co.'s sale of its partnership interest in Walnut Co.'s future profits. Walnut Co. was created for the express purpose of developing a specific tract of land and selling the houses which it would construct thereon. Upon completion of the project and final sale of all the houses, Walnut Co. would cease to function. At the time of the sale, 111 of such houses [5] were in existence, 39 of which were the subject of a deposit receipt or purchase agreement. Moreover, at such time the profit on each house could reasonably be estimated (although, of course, it could not be foreseen when the houses would be sold and how many would be sold). The purposes of section 1221 [6] were (1) "to relieve the taxpayer from * * * excessive burdens on gains resulting *72 from a conversion of capital investments," and (2) "to remove the deterrent effect of those burdens on such conversions." See Commissioner v. P.G. Lake, Inc., 356 U.S. 260(1958). This exception has always been narrowly construed. See Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955). We do not see here any conversion of a capital investment. The substance of what was assigned was the right to receive future income. The lump sum consideration seems essentially the present value of income which the recipient, Hale Co., would otherwise obtain in the future as ordinary income. Commissioner v. P.G. Lake, Inc., supra.Therefore, we are of the opinion that Hale Co. realized ordinary income on the transaction in issue as if it had received such income directly from Walnut Co. See Commissioner v. P.G. Lake, Inc., supra.
Facts as to Issue 2 The principal business of Hale Co. prior to and during the years involved herein was development of single-family residential building lots and the construction of single-family residences, either on its own account, or as a general contractor, or as a general partner in certain tract partnerships. *73 From the time of its inception (March 1953) to February 28, 1958, Hale Co. participated in the construction of 1,397 single-family residences, and the development of 84 single-family residential lots on 15 parcels of ground which constituted 15 subdivisions. Furthermore, during the years in issue, Hale Co. purchased and sold 5 other parcels of land not involved in the subdivision and construction of single-family residences. In October 1954, Hale Co. purchased a 10-acre parcel on Harbor Boulevard in Orange County, California (hereinafter referred to as the Honer property) for a total consideration of $40,000. Hale Co. purchased the Honer property with the intention of building a Hale Co. office building, together with a commercial shopping area appurtenant to said office building. Two acres were to be used for the office building; the balance of eight acres for the shopping area. With this plan, Hale Co. applied for and, on March 8, 1955, obtained commercial zoning for the Honer property. Hale Co. experienced certain difficulties in 1955 in financing the proposed development of the Honer property and after having received two unsolicited and attractive offers to purchase the property, *74 Hale Co. decided to sell the land prior to its development. One-half of the Honer property was sold by Hale Co. on or about June 8, 1955, for the sum of $65,000, and the remaining one-half was sold on the installment basis on or about June 17, 1955, for the sum of $70,000. Hale Co., in its partnership income tax return filed for the taxable year ended February 29, 1956, reported as long-term capital gain on the first sale the amount of $39,084.47. Gain on the second sale was reported as long-term capital gain on the installment basis, as follows: Taxable year ended February 29, 1956
$13,519.10
Taxable year ended February 28, 1957
12,547.24
Taxable year ended February 28, 1958
17,171.76
$43,238.10
On or about June 14, 1954, Hale Co. entered into an escrow agreement to buy from Hallie L. Watson 10 acres of unimproved land (hereinafter referred to as the Watson property) for a total consideration of $28,500. At the time the escrow was entered into, Hale Co,'s intention was to develop this parcel into a small residential subdivision. Subsequently, despite Hale Co.'s protest, the zoning on said property was changed to industrial use. Notwithstanding the zoning *75 change, Hale Co. closed the escrow and completed purchase of the Watson property on June 14, 1955. Hale Co. then considered developing said property for industrial or commercial use and holding it for investment. In 1956, Hale Co. received an unsolicited offer for the sale of said property. As a result of this offer, Hale Co. sold the property on or about August 31, 1956, for the amount of $50,000. Hale Co. reported gain on this sale in the amount of $18,012.57 as long-term capital gain. On or about March 5, 1954, Hale Co. entered into an escrow with Rea Kalis for the purchase of 19.61 acres of unimproved land on Harbor Boulevard in Orange County (hereinafter referred to as the Kalis property) for a total consideration of $78,440. The purchase escrow was terminated on December 24, 1954. In order to finance a portion of the purchase price, Hale Co. sold the property that same day for $60,000, with an option to repurchase for $75,000. The repurchase option was exercised on or about November 18, 1955, and Hale Co. reacquired the land. The Kalis property was purchased for the purpose of building a shopping center which would be a long-term investment of Hale Co. Zoning for commercial *76 use was applied for and obtained. However, in 1956 Hale Co., as general partner of Lincoln-Western Co., experienced considerable difficulty in the development of a tract in Orange County and was in danger of being declared in default of a construction loan trust deed note payable. To avoid such occurrence, Hale Co. sold the Kalis property on or about December 19, 1956, for $200,000 and contributed $62,000 to Lincoln-Western Co. Hale Co. reported gain on said sale in the amount of $102,315.46 as long-term capital gain on its partnership return filed for the taxable year ended February 28, 1957. On or about July 23, 1954, Hale Co. entered into a purchase contract with Ernest A. Watson and others for the purchase of certain land in Orange County, which land was deed to Hale Co. on November 5, 1954. On or about September 24, 1954, Hale Co. entered into a contract with Eleanor Stanley Smallwood and others for the purchase of certain land contiguous to the Watson property acquired on November 5, 1954. The Smallwood property was deeded to Hale Co. on March 21, 1955. Hale Co.'s purpose in purchasing the Watson and Smallwood properties was to subdivide the same and build single-family houses *77 thereon. Hale Co. subdivided a portion of said properties (hereinafter referred to as the Watson-Smallwood property) and deeded both of these said properties to College Mesa Company (hereinafter referred to as Mesa Co.). Mesa Co. was a "tract partnership" which had been created pursuant to a partnership agreement executed on October 11, 1954, [7] in which Hale Co. was named as the general partner and eight corporations, a trust, and an individual were named as limited partners. *78 One part of the Watson-Smallwood property (66 acres) was below the water table and could not be used for subdivision and development without some system of drainage. Mesa Co. intended to hold said portion until it became capable of subdivision and, in the interim, leased it to a farmer on a share-crop basis. The purpose of forming Mesa Co. was to subdivide and improve the Watson-Smallwood property and build single-family residences thereon. Upon a suggestion of one of the partners in Mesa Co., the 66 acres were sold on or about November 1, 1957, for a total consideration of $267,156. Mesa Co., on its partnership return filed for the taxable year 1957, reported gain on this sale in the amount of $56,577.23 as a long-term capital gain. Hale Co. on its partnership return filed for the taxable year ended February 28, 1958, reported the amount of $19,348.76. Ultimate Findings of Fact as to Issue 2 Neither the Honer property, nor the Watson property, nor the Kalis property, nor the Watson-Smallwood property was held for sale to customers in the ordinary course of trade or business. Opinion as to Issue 2 The property with which this issue is concerned consists of various parcels *79 of undeveloped real estate acquired by Hale Co. These parcels have been identified as the Honer property, the Watson property the Kalis property, and the Watson-Smallwood property. All of the aforesaid parcels were sold by Hale Co. at a profit during the years in issue, with the exception of the Watson-Smallwood property which, after being acquired by Hale Co., was deeded by it to Mesa Co. and was sold by Mesa Co. at a profit. Respondent argues that the property involved was excepted from the general definition of capital assets because "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221(1) or section 1231(b)(1)(B). Petitioners argue that the property was not so held because they were not engaged in the trade or business of selling unimproved real property. They contend (1) that their only trade or business was that of subdividing real property and constructing single-family residences thereon which they held for sale to ultimate purchasers, and (2) that the sale of the property in issue did not come within the scope of that business. We have concluded and found as a fact (1) that the sales in *80 five parcels of the four tracts of unimproved real estate [8] in issue were not sales of property to customers within the ordinary course of their subdivision and development business and (2) that petitioners were not otherwise engaged in the business of selling unimproved real estate. The evidence is clear that petitioners were in the business of developing real estate and building single-unit dwellings thereon for sale to ultimate purchasers. From the time of its inception to February 28, 1958, Hale Co. participated in the construction of 1,397 single-family residences, and the development of 84 single-family residence lots on 15 parcels of ground which constituted 15 subdivisions. Mesa Co. was in business to develop and improve with single-family residences the Watson-Smallwood property. While this is one field of the real estate business, it is more restricted than a general real estate business. We think it clear from the nature of Hale Co.'s and Mesa Co.'s building and development business that the property involved in this issue was not held for sale to customers in the ordinary course of that *81 business. It has been held generally that unimproved or undeveloped property in the hands of a taxpayer whose business is that of the improvement and development of raw land, and thereafter its sale, is a capital asset and that its sale in that condition results in capital gain. Nelson A. Farry, 13 T.C. 8 (1949); Charles E. Mieg, 32 T.C. 1314 (1959); Eline Realty Co., 35 T.C. 1 (1960). There are, however, exceptions where such sales have been held to result in the gain being treated as ordinary income because such sales have been found to come within the scope of the taxpayer's development business. Donald J. Lawrie, 36 T.C. 1117 (1961). From an examination of these and like cases, we are of the opinion that (1) they set no universal precedent for determining all factual situations in the general area and (2) the instant case is distinguishable on its facts. In Donald J. Lawrie, supra, the taxpayer purchased certain acreage (13.719 acres) for the purpose of subdivision and construction of houses thereon. The taxpayer subdivided the property, improved it [9] (with the exception of 1.26 acres) and built houses on several *82 lots. After selling 13 houses (and lots), the taxpayer sold in one transaction the remaining property which included 21 improved lots and the 1.26 acres of unimproved land. The taxpayer incurred at least $37,000 in improvement and development costs on the original unimproved tract which had cost him $41,157 to purchase. On the basis of these facts, this Court held that, in effect, the taxpayer was merely disposing in bulk of property held for sale to customers in the ordinary course of his business. In the instant case, unlike in the Lawrie case, Hale Co. and Mesa Co. made no improvements of any sort on any of the tracts of vacant land sold. The unimproved parcels involved herein, unlike the property sold in the Lawrie case, bore no identity to the types of improved property (single-family residences) which petitioners sold in the ordinary course of their business, i.e., home building and development. We are of the opinion that the sales by Hale Co. and Mesa Co. of the vacant tracts involved herein were not sales of property held primarily for sale to customers in the *83 ordinary course of their business, i.e., real estate development and improvement. Compare Isaac Emerson, 12 T.C. 875 (1949), wherein this Court held that a dairy farmer is not primarily engaged in the sale of beef cattle and the sale by him of some of the stock culled from his dairy herd is not a sale of property held primarily for sale to customers in the ordinary course of his business. See also Watson v. Commissioner, 345 U.S. 544 (1953). Although we recognize that a taxpayer may be engaged in more than one trade or business, we believe, upon consideration of all the evidence in this case, that Hale Co. and Mesa Co. were not in the business of buying and selling unimproved real estate. Therefore, the property in question was not held for sale to customers in the ordinary course of such a business. The question of whether a taxpayer is in the business of selling real property, under varying factual situations, has been litigated numerous times and courts have repeatedly emphasized that in the final analysis the decision must rest upon a consideration of the facts present in the particular case. Eline Realty Co., supra.
Several well-recognized *84 tests have been evolved by the courts in the course of deciding whether, at the time of sale, property is a capital asset or is property held for sale to customers in the ordinary course of a trade or business. Though variously stated, these tests include: (1) the reason, purpose and interest for which the property was acquired and held; (2) the substantiality of transactions; (3) the frequency and continuity of transactions over a period of time as distinguished from casual or isolated transactions; and (4) the activity of the seller with respect to the property, such as the extent of his improvements or his activity in promoting sales. Eline Realty Co., supra. We are covinced that Hale Co.'s and Mesa Co.'s sales of the parcels of unimproved land involved herein did not constitute sales to customers in the ordinary course of business nor were they held for such purpose. The record shows a complete absence of any sales activity by Hale Co. and Mesa Co. with respect to the tracts in issue. Hale Co. and Mesa Co. did no advertising, hired no agents, did not list the properties for sale, and erected no signs. They merely accepted unsolicited offers. No steps were *85 taken to improve or develop the five parcels. None of the five properties were staked out and subdivided nor were any roads built. The only action which Hale Co. took having any relation to the desirability of the property in question was to apply for and obtain commercial zoning for the Honer and Kalis properties. Such action was in line with its intention to develop those properties commercially. Furthermore, in view of Hale Co.'s home building and realty development activity, we do not believe that its sale of four parcels of land over a period of three years is so frequent or consistent as to indicate that with respect to these sales Hale Co. was in the trade or business of buying and selling vacant land. Similarly, we do not believe Mesa Co.'s sale of one undeveloped parcel supports respondent's contentions. Not only are there absent here the elements of development and sales activity, but there are also other circumstances which, in our opinion, explain the sales here involved in terms other than those connotating business activity. We have set forth in our Findings of Fact with great specificity the circumstances which surrounded the purchase and sale of the several properties *86 involved herein. We believe that said circumstances support petitioners' position that the four properties involved herein were never held by Hale Co. and Mesa Co. for sale to customers in the ordinary course of a trade or business, to wit, the development and improvement of real property. Instead, we are of the opinion that the sales of the four tracts in five parcels were, at best, isolated, incidental and even accidental transactions which hardly provide the substance of a trade or business. Accordingly, we conclude that petitioners were not holding such real estate primarily for sale to customers in the ordinary course of their trade or business. Thus, we hold for petitioners on this issue. Facts as to Subissue 2(a) On January 2, 1957, Hale Co. distributed to Carter Darnell, Samuel J. Berland, and Herman M. Hale an undivided one-third interest each in a note receivable from a Ralph L. Hoyle, which note had an aggregate balance of $6,064.22. This said note had been received originally by Hale Co. as part of the consideration for the sale of 5 acres of property which it had sold on June 17, 1955, for $70,000 on the installment basis. At the date of said distribution by Hale *87 Co. of the note, the unrealized profit thereon aggregated $4,078.75. The petitioners in Docket Nos. 1395-63 and 1396-63, in filing their respective income tax returns for the taxable year 1957, reported $1,359.55 (their respective partnership shares of the said unrealized profit) as a long-term capital gain. Opinion as to Subissue 2(a) The question to be decided in this subissue is whether the petitioners in Docket Nos. 1395-63 and 1396-63 realized ordinary income or capital gains to the extent of profits aggregated on a note which they received as a part of their distributive share of profits realized in 1957 upon the sale of certain partnership property of Hale Co. Hale Co. had received the note involved herein as partial consideration for the sale of one portion of the Honer property to a third party. Petitioners contend that profits which had accrued on the note at the time of its distribution to petitioners constituted capital gain realized from the sale by the partnership of the Honer property. Respondent takes the position that the profit in question, arising as it did from the sale of property which respondent contends was held for sale in the ordinary course of Hale *88 Co.'s business, consituted ordinary income to petitioners in the said two dockets. In view of our conclusion in issue 2 above and our finding that the Honer property was not held for sale to customers in the ordinary course of Hale Co.'s trade or business but was rather a capital asset, we hold that the aggregated profit on said note is taxable as capital gain to these petitioners. Accordingly, we hold for petitionrs on this issue. Facts as to Subissue 2(b) The facts as to subissue 2(b) are incorporated within the facts as to issue 2, supra. Opinion as to Subissue 2(b) The second subissue is (1) whether petitioners Hale and Berland are entitled to deductions for capital loss carryovers in 1956 resulting from an alleged loss on the sale of property (the Kalis property) claimed to have been sustained in 1955 (a year not directly before this Court) or (2) whether the amount of such alleged loss should serve to increase Hale Co.'s basis in the said property (which Hale Co. reacquired), thereby reducing Hale Co.'s gain on the ultimate sale of the Kalis property by Hale Co. in 1956. It is respondent's contention that no such "loss" occurred in an earlier year in connection *89 with this said property and that no expense equivalent to the alleged loss was incurred by Hale Co. which would serve to increase the basis of the sale property. The alleged loss claimed herein arose in the following transaction: (1) On or about March 5, 1954, Hale Co. entered into an escrow for the purchase of the Kalis property for a total consideration of $78,440 in cash; (2) Hale Co. planned to develop said property, on the basis of a joint venture with a third party, into a commercial shopping center; (3) lacking funds to purchase the Kalis property, Hale Co. found it necessary to finance the acquisition by means of a loan supplied by said third party; (4) the third party wanted to realize more than the legal rate of interest on its loan to finance Hale Co.'s purchase of the land; and (5) the parties made use of a purchaserepurchase device as a means to disguise a customary loan arrangement. [10]
Thus it would seem, by weight of petitioner Berland's own testimony, that the amount which *90 petitioners contend is a capital loss or a capital expenditure is more in the nature of an interest charge. Interest has been defined as compensation fixed by the parties for the use, or forbearance or detention of money. Petitioner Berland freely admitted that (1) the purpose of the above-described transaction was to borrow money and (2) the sale-purchase arrangement was dictated merely by the lender's desire for interest above the legal rate. Interest paid or incurred with respect to property may be capitalized only if a taxpayer makes an election with respect to section 266 [11] under the regulations prescribed thereto. Such election may be exercised by filing with an original return for which the election is made a statement indicating the item or items which the taxpayer elects to treat as chargeable to capital account. Petitioners herein have failed to make such election in their 1955 income tax returns and therefore their position on this issue is without merit. *91 Facts as to Issue 3 On April 1, 1953, Hale Co.'s partners agreed in writing to do such entertaining at home as may be necessary, and not to be reimbursed therefor by the partnership. During 1956, 1957, and 1958, petitioners Hale and Berland frequently entertained investors, subcontractors, suppliers, and other business visitors in their homes. The nature of such entertainment varied from intimate dinner parties to professionally catered affairs with up to 200 invited guests. The expenses for the foregoing entertainment were entirely separate and apart from other partnership entertainment expenses for which these said petitioners were reimbursed by Hale Co. Opinion as to Issue 3 The third issue to be decided presents the question of whether petitioners in Docket Nos. 1395-63 and 1396-63 are entitled to individual deductions of $1,000 in each year in issue for alleged entertainment expenses. As a general contractor and builder, Hale Co. was engaged in business transactions with investors, suppliers, subcontractors, and other builders. It is clear from petitioners' testimony that on frequent occasions they entertained such persons in their own homes. [12] We believe that petitioners' *92 expenses relating to such entertainment were attributable to the operation of a trade or business within the meaning of section 162. On the other hand, their testimony is (1) general in connection with the amounts expended for such entertainment [13] and (2) uncertain as to the frequency of such entertainment. Furthermore, petitioners rely solely upon said testimony to substantiate the alleged expenditures. However, we think it clear that the record supports the conclusion that these petitioners did personally incur entertainment expenses in connection with their business, i.e., Hale Co. Although we cannot make a precise determination of the amount of petitioners' deductible expenses, we think that this is a proper case for applying the principles of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). This entails an exercise of our best judgment. Considering the evidence as a *93 whole, applying the principle referred to above, and bearing heavily against petitioners in their inexactitude, we think that petitioners are each entitled to deductions in the amounts of $300 for each of the years involved herein. Facts as to Issue 4. On or about April 2, 1955, Richard M. Tillis died and his partnership interest in Hale Co. was subsequently retired. In payment thereof, Hale Co. made distributions of cash and partnership property to the estate of Richard M. Tillis. During the taxable year ended February 29, 1956, Hale Co. filed an election under section 754. In accordance with such election, the basis of remaining partnership property of Hale Co. was increased as a result of distributions to the estate of Richard M. Tillis in excess of the basis of Tillis' partnership interest. Hale Co. has never revoked the election which it filed in 1956 under section 754. On January 1, 1957, Silvia Darnell (formerly Silvia Lardner) executed an assignment of her partnership interest in Hale Co. to Carter Darnell, Herman M. Hale and Samuel J. Berland, withdrew as a general partner of Hale Co. and received distributions of partnership property and promissory notes, as follows: *94 Cash
$ 4,736.14
Assignment of partnership trust deed
note receivable
6,064.22
Notes payable executed by Hale Co.
(secured by liens on remaining part-
nership property)
46,199.64 Additionally, Hale Co. assumed, as Silvia Darnell's share of partnership liabilities, liabilities totaling $40,026. Following the withdrawal of Silvia Darnell from the partnership as aforesaid, Hale Co. increased the basis of remaining partnership property by the aggregate amount of $48,697.58, as representing the excess of the payments to Silvia Darnell over the basis of her partnership interest. On January 10, 1958, Carter Darnell withdrew as a general partner from Hale Co. in furtherance whereof the remaining members of Hale Co. executed on that date an Agreement for Retirement of Partnership Interest. In connection with such retirement, Carter Darnell received distributions of partnership property and promissory notes as follows: Partnership property distributed (at
partnership basis)
$78,455.43
Notes payable executed by Hale Co.
(secured by liens on remaining
partnership property)
36,736.10
Less: Liabilities assumed on part-
nership property distributed
(55,259.35)
*95 Additionally, Hale Co. assumed, as Carter Darnell's share of partnership liabilities, liabilities totaling $358,595.99. Following the withdrawel of Carter Darnell from the partnership as aforesaid, Hale Co. increased the basis of remaining partnership property by the aggregate amount of $51,174.48, as representing the excess of the payments to Carter Darnell over the basis of his partnership interest. Opinion as to Issue 4 The fourth issue presents the question whether Hale Co. is entitled to deductions in 1957 and 1958 for payments made by Hale Co. to two withdrawing partners, Silvia Darnell and Carter Darnell. Upon the retirement of Richard M. Tillis from Hale Co. in 1955, Hale Co. filed an election under section 754 to adjust the basis of remaining partnership property in the manner provided by section 734 by reason of the distribution of Hale Co.'s property to the Tillis estate. This election remained in effect at the time of the retirement of Silvia's and Carter's partnership interests in 1957 and 1958, respectively. Following both Silvia's and Carter's retirements, Hale Co. accordingly adjusted the basis of remaining partnership property in the amounts of $48,697.58 *96 and $51,174.48, respectively. In respect to the withdrawal from Hale Co. of Tillis in 1955, Silvia in 1957 and Carter in 1958, the petitioners in Docket Nos. 1395-63 and 1396-63 contend that their election under section 754 in those years to increase the basis of remaining partnership property was erroneous and that Hale Co. should be permitted to treat the distributions made by the partnership to Silvia and Carter as "guaranteed payments" within the meaning of section 376. If these petitioners are allowed to characterize such distributions as "guaranteed payments," such amounts would be deductible from partnership income. Respondents contends that the partnership is bound by its election under section 754 (said election never having been revoked by the partnership) and that, in any event, it has not been shown that the distributions qualify for treatment as "guaranteed payments" within the meaning of the statute. For reasons that will shortly become apparent, we will first discuss respondent's alternative argument. Petitioners seem to be arguing that section 736(a) provides that payment made in liquidation of a retiring partner's interest shall be considered as a "guaranteed *97 payment" if the amount thereof is determined without regard to partnership income, and that the payments here, therefore, constituted guaranteed payments per se. In so arguing, petitioners ignore section 736(b). Prior to the 1954 Code when a partnership liquidated a partner's interest, there arose the question as to whether it was continuing to pay the retiring partner his share of income or was buying or liquidating his partnership interest. Section 736 [14] was written to settle conflicts in this area. *98 It is clear that where payments are made under section 736 the amounts paid may represent several items and, accordingly, payments must be allocated to such individual items. Briefly, this section provides that liquidating payments shall be treated as in exchange for the withdrawing partner's interest in partnership assets (except unrealized receivables and, under some circumstances, goodwill) and any excess shall be treated as "guaranteed payments" or "distributive shares of income" under section 736(a). Petitioners have not adduced any evidence showing that the total liquidating payments made by Hale Co. to Silvia in 1957 or to Carter in 1958 were in excess of the reasonable or fair market value of their partnership interests in Hale Co. when such payments were made and were therefore other than payments in exchange for the Darnells' interests in Hale Co. Petitioners have not argued that section 736(b)(2) applies to the payments in question. Indeed, the record lacks any evidence which would suggest that the payment to the Darnells constituted amounts paid for unrealized receivables or goodwill. From the foregoing, it can only be concluded that the distributions made by Hale *99 Co. to the Darnells were in their entirety payments made in liquidation of the Darnells' interests in partnership property within the meaning of section 736(b)(1). Therefore, we hold for respondent on this issue. Facts as to Issue 5 On February 7, 1958, Samuel J. Berland, Herman M. Hale and Hale Co. executed an option agreement providing, inter alia, for the withdrawal from Hale Co. of Trenching Co. (a partner in Hale Co., whose members were Dexter L. Godbey, Charles L. Godbey and William H. Godbey), and on February 28, 1958, the said option was exercised by written notice executed by the latter individuals on behalf of Trenching Co.
Upon withdrawal from Hale Co., Trenching Co. received all of Hale Co.'s interest in certain real property and a promissory note secured by a deed of trust for property located in Riverside County, which had hitherto been held by Irving Kaufman as undisclosed trustee for Hale Co., Dexter L. Godbey, Charles L. Godbey and William H. Godbey. Opinion as to Issue 5 The facts on this issue are not in dispute and may be summarized as follows: During 1958, and for a number of years prior thereto, petitioners in Docket Nos. 1401-63, 1402-63 and 1403-63 were *100 the general partners of Trenching Co. In December 1953, Trenching Co. became a limited partner of Hale Co. Somewhat over four years later, Trenching Co. withdrew as a limited partner of Hale Co. Upon terminating its limited partnership interest in Hale Co., Trenching Co. received real property and a promissory note in exchange for its interest in Hale Co.'s assets. Petitioners herein treated the amount realized by Trenching Co. upon its retirement from Hale Co. as a long-term capital gain from the sale or exchange of a capital asset under section 741. The assets of Hale Co. at the time Trenching Co. withdrew included, among other things, Hale Co.'s partnership interest in Mesa Co.'s future profits. [15]
Respondent's argument may be summarized as follows: Hale Co.'s interest in Mesa Co. constituted in substance an unrealized receivable. In withdrawing from Hale Co. in 1958, Trenching Co., in effect, turned over to Hale Co.'s surviving partners Trenching Co's proportionate interest in unrealized receivables (represented by Hale Co.'s interest in Mesa Co.) and received in exchange therefor, Hale Co.'s entire *101 interest in certain land in Riverside County. (The said Riverside County land was property owned by Hale Co. directly.) Thus, Trenching Co., upon its withdrawal from Hale Co., released to the surviving partners of Hale Co. Trenching Co.'s share of unrealized receivables and obtained in exchange therefor property which did not constitute an unrealized receivable. By reason of the foregoing, respondent asserts that section 751(b) [16] is applicable; and, consequently, to the extent of gain determined, the amount realized by these petitioners upon the above-described "exchange" is to be considered as an amount realized from the sale or exchange of property other than a capital asset under section 751(a)(1) and is therefore taxable to them as ordinary income. *102 Petitioners contend that Hale Co.'s interest in, and relationship to, Mesa Co. were that of a general partner contributing services in return for a partner's share in the future profits and losses of the subpartnership. Thus, petitioners maintain that Hale Co.'s interest was a partnership interest in a subpartnership and, as such, should not be regarded as an unrealized receivable. The issue before us involves a narrow issue of law and fact - namely, whether or not in the context of this case, Hale Co.'s interest in Mesa Co. constituted an "unrealized receivable" for purposes of section 751. Like Walnut Co., Mesa Co. was created for the express purpose of developing a specific tract of land and selling houses which it would construct thereon. Upon completion of the project and final sale of all the houses, Mesa Co. would cease to function. Hale Co. received for its contribution of future services to Mesa Co. a right to participate in Mesa Co.'s profits. Hale Co. had no capital interest in Mesa Co. The term "unrealized receivables" is defined in section 751(c) to mean "any rights (contractual or otherwise) to payment for * * * services rendered, or to be rendered." We believe *103 that the characterization of Hale Co.'s interest in Mesa Co. as an "unrealized receivable" within the definition of section 751(c) neither offends the statutory scheme nor the purpose therefor, but, instead, constitutes a valid implementation thereof. The legislative history of section 751 is itself not wholly clear, but we think it supports a sufficiently broad reading of the statutory language to include Hale Co.'s partnership interest in Mesa Co.'s profits under the particular factual situation presented herein within the scope of section 751(c). Roth v. Commissioner, 321 F. 2d 607 (C.A. 9, 1963), affirming 38 T.C. 171 (1962). The report of the Senate Committee states, "The term 'unrealized receivables' applies to any rights to income which have not been included in gross income under the method of accounting employed by the partnership." S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83rd Cong., 2d Sess., p. 99 (1954). Essentially the same language appears in the report of the House Committee. H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83rd Cong., 2d Sess., p. 71 (1954). The purpose of Congress in enacting section 751 was *104 "to prevent the conversion of potential ordinary income into capital gain by virtue of transfers of partnership interests * * *." S. Rept. No. 1622, supra, at p. 98; see also H. Rept. No. 1337, supra, at p. 70. It is reasonably clear from the discussion of section 751 in both the Senate and House Reports that Congress meant to exclude from capital gains treatment any receipts which would have been treated as ordinary income to the partner if no transfer of the partnership interest had occurred. Roth v. Commissioner, supra.The receipts in question herein were precisely of this character. In view of the fact that Hale Co. acquired its interest in Mesa Co.'s profit solely by reason of its contribution of services thereto, we are of the opinion that, under the particular circumstances herein, said interest constitutes "rights * * * to payment for services rendered, or to be rendered" within the meaning of section 751(c). The fact that Hale Co. had no guarantee whatever of receiving any income from Mesa Co. does not affect the status of its interest therein as an unrealized receivable. See Roth v. Commissioner, supra. Accordingly, we hold for respondent *105 on this issue. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Samuel J. Berland and Lillian Berland, Docket No. 1396-63; William H. Godbey and Vivian A. Godbey, Docket No. 1401-63; Charles L. Godbey and Geraldine L. Godbey, Docket No. 1402-63; and Dexter L. Godbey and Iva F. Godbey, Docket No. 1403-63.↩
2. Said agreements were subject to the approval of a lending agency, the Veterans Administration, or the Federal Housing Administration, and the seller.↩
3. Under the regulations, the mere receipt of a partnership interest in future profits does not create any tax liability. Sec. 1.721-(1)(b), Income Tax Regs.↩
4. At the time of the transaction involved herein, Walnut Co. had no profits.↩
5. Petitioners have not shown that Walnut Co. contemplated the construction of, or did construct, any other houses.↩
6. Unless otherwise indicated, all section references are to the Internal Revenue code of 1954, as amended.↩
7. The above-said partnership agreement of October 11, 1954, of Mesa Co. provided that the limited partners were to contribute cash to the said partnership, in return for which they would receive the net profits of the said partnership until the limited partners had received a return of their cash contributions and a certain percentage of Mesa Co.'s net profits. All of the remaining net profits of Mesa Co. were to be paid to the general partner. Hale received its partnership interest in Mesa Co. in exchange for its contribution of services thereto. The first losses, if any, of the partnership were to be borne by Mesa Co.'s limited partners to the extent of their capital contributions. Any losses in excess of such amount were to be borne by the general partner alone, and the limited partners were not to be liable for any of such losses.↩
8. Hale Co.'s sales constituted four and Mesa Co.'s sales constituted one.↩
9. The improvements consisted of water, grading, paving, engineering, drainage and concrete culverts, etc.↩
10. Hale Co. sold the Kalis property to the third party for approximately $60,000 and thereafter reacquired said property in 1955, pursuant to an option agreement, for $75,000.↩
11. SEC. 266. CARRYING CHARGES. No deduction shall be allowed for amounts paid or accrued for such taxes and carrying charges as, under regulations prescribed by the Secretary or his delegate, are chargeable to capital account with respect to property, if the taxpayer elects, in accordance with such regulations, to treat such taxes or charges as so chargeable.↩
12. Petitioners merely assert that their entertainment expenses were in excess of the amounts claimed in their returns. ↩
13. On April 1, 1953, Hale Co.'s partners agreed in writing to do such entertaining at home as may be necessary, and not to be reimbursed therefor by the partnership.↩
14. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) Payments Considered as Distributive Share or Guaranteed Payment. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered - (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership. (b) Payments for Interest in Partnership. - (1) General Rule. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a). (2) Special Rules. - For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for - (A) unrealized receivables of the partnership (as defined in section 751(c)), or (B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will.↩
15. Hale Co. received such interest upon the organization of Mesa Co.↩
16. SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS. (b) Certain Distributions Treated as Sales or Exchanges. - (1) General Rule. - To the extent a partner receives in a distribution - (A) partnership property described in subsection (a)(1) or (2) in exchange for all or a part of his interest in other partnership property (including money), or (B) partnership property (including money) other than property described in subsection (a)(1) or (2) in exchange for all or a part of his interest in partnership property described in subsection (a)(1) or (2), such transactions shall, under regulations prescribed by the Secretary or his delegate, be considered as a sale or exchange of such property between the distributee and the partnership (as constituted after the distribution).↩