**UNITED STATES of America, Appellant,**

v.

**W. H. COCKE et al., Appellees.**

**No. 23963.**

United States Court of Appeals Fifth Circuit.

July 31, 1968.

Rehearing Denied Oct. 16, 1968.

---

Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, Melva M. Graney, Crombie J. E. Garrett, Richard C. Pugh, Grant W. Wiprud, Stephen H. Paley, Meyer Rothwacks, Stuart A. Smith, Attys., Dept. of Justice, Washington, D. C., Morton L. Susman, U. S. Atty., James R. Gough, Asst. U. S. Atty:, Houston, Tex., for appellant.

Homer L. Bruce, William C. Griffith, Houston, Tex., for appellees.

Before JOHN R. BROWN, Chief Judge, and TUTTLE*, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON and CLAYTON, Circuit Judges.**

GOLDBERG, Circuit Judge:

This case—involving questions of oil and gas depletion, depreciation, and intangible drilling and development costs [1]—provides a setting for our occasional departure from the doctrine of stare decisis. The taxpayer argues, and the government concedes, that the disposition of the present case depends upon whether the doctrine of Commissioner of

---

* Subsequent to oral argument on hearing en banc, January, 1968, at Houston, Texas, Judge Tuttle has become a Senior Judge. 28 U.S.C. § 371(b). As he participated in that hearing, he is competent to participate in the determination thereof. 28 U.S.C. § 46(c) ; Allen v. Johnson, 5 Cir. 1968, 391 F.2d 527 (en banc).

** This is one of six cases submitted en banc to the Court at Houston. The cases are set out in Allen v. Johnson, supra, 391 F.2d at 528 (fn. 1 of the opinion) and in Miller v. Amusement Enterprises, Inc., 5 Cir. 1968, 394 F.2d 342, 344 (en banc) (at *).

1. Pertinent sections of the Internal Revenue Code of 1954 are set out in an Appendix to this opinion.

Internal Revenue v. J. S. Abercrombie Co., 5 Cir. 1947, 162 F.2d 338, stands or falls. Because the Court believed the question to be one of exceptional importance to which uniformity of decision is vital, a hearing en banc was ordered pursuant to Fifth Circuit Court Rule 25(a).[2] We now conclude that our decision in *Abercrombie* must be overruled.

## I.

*Abercrombie* represents one form of a carried interest transaction in the field of oil and gas. In any carried interest transaction, one of the owners of the working interest in property is willing to advance the funds necessary for drilling of wells and development of production of oil or gas, and to look only to the other owner's share of production for the other owner's contribution to such costs. The party who puts up the money is called the carrying party because he risks his entire investment against the possibility that there will not be enough production to reimburse him for his costs. The other party is called the carried party because he takes no risks. The carried party agrees to wait until the carrying party has recouped his drilling and development costs out of production before he takes any payments on his share. The carried party is not personally liable for any costs and loses nothing if there is no production.

The courts and the commentators have recognized three types of carried interests. In the *Manahan* type,[3] the carried party originally owns all of the working interest and assigns the entire interest to the carrying party, who is obligated to drill and develop a well or wells. This assignment is subject to a right of reversion of a portion (typically one-half) of the working interest to the carried party if and when the drilling and development costs are recouped by the carrying party. After this reversion, income and expenses are shared by carried and carrying parties according to their proportionate shares of the working interest.[4]

In the *Herndon* type,[5] the carried party originally owns all of the working interest and assigns half (or some other share) of the working interest to the carrying party, who is obligated to drill and develop. The carried party also assigns to the carrying party an oil production payment covering his retained working interest. This assignment ends only when the carrying party has recouped his drilling and development costs.

It has been held that during the period of the recoupment the carried party in a *Manahan* or *Herndon* carried interest gets no income and no deductions for depletion or depreciation, and that all income and deductions go to the carrying party. See Weinert's Estate v. Commissioner of Internal Revenue, 5 Cir. 1961, 294 F.2d 750. See also Breeding, "The Trend in Carried Interest Cases," 17 Southwestern Law Journal 242 (1963); Galvin, "The 'Ought' and 'Is' of Oil-and-Gas Taxation," 73 Harvard Law Review 1441, 1492–94 (1960); Bullion, supra note 4, at 606–607.[6]

The third form of carried interest is represented by Commissioner of Internal

2. "Rule 25(a). En Banc Hearing or Rehearing.
"(a) *When Hearing or Rehearing en Banc Will be Ordered.* A majority of the circuit judges who are in regular active service may order that an appeal or other proceeding be heard or reheard by the court of appeals en banc. Such a hearing or rehearing is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance."

3. Named for Manahan Oil Company, 1947, 8 T.C. 1159.

4. See Bullion, "A New Look at Tax Aspects of Oil and Gas Sharing Arrangements," Southwestern Legal Foundation Eighth Annual Institute on Oil and Gas Law and Taxation 603, 604 (1957).

5. Named for Herndon Drilling Company, 1946, 6 T.C. 628.

6. Mr. Bullion explains a difference in tax treatment of depletion between *Manahan* and *Herndon* types which is not in issue here.

Revenue v. J. S. Abercrombie Co., 5 Cir. 1947, 162 F.2d 338. In that case the carried party had assigned all but 1/16 of its working interest to the carrying party. The carrying party was to drill and operate the wells, to pay all costs and expenses out of production, and to pay to the carried party 1/16 of "operating profits" (income after the deductions for costs and expenses had been made). In the calendar year 1941 there was nothing to pay to the carried party under the agreement because deductions for costs and expenses exceeded income. The carrying party's tax return, however, did not include as income 1/16th of the gross proceeds, as the carrying party claimed that such income was attributable to the carried party. The Commissioner contended that the carried party had retained only a 1/16 interest in *net* profits, and that none of the gross profits used by the carrying party in recouping its outlays was income taxable to the carried party.

In reversing for the carrying party, we stated the following:

"In some instances the law may look through form to substance to get to the right of a controversy, but in ordinary cases tax consequences under federal law often depend upon property rights under local law, which in turn may be fixed by agreements between owners of the property. * * *

* * * "[O]ur decision is controlled by the fundamental principle that income is taxable to the owner of the property producing the same, and that an assignment in anticipation of such income is ineffective to avoid taxation thereof to the real owner. The economic reality of the transaction was that the assigning co-owners mortgaged their interest to their operating co-

owner; and by so doing they not only reaped the benefit of development but acquired an undivided one-sixteenth interest in valuable physical equipment placed on the property by the operators." 162 F.2d at 339, 340.

We held in *Abercrombie* that the carried party's retention of a 1/16 interest in "operating profits" meant that 1/16 of all gross income, no matter whether paid out to the carried party or retained and used by the carrying party for drilling or development costs or expenses, was income to the carried party. Twelve years later, in Prater v. Commissioner of Internal Revenue, 5 Cir. 1959, 273 F.2d 124, we "followed *Abercrombie* to its logical conclusion and allowed the carried party [in an *Abercrombie* transaction] to deduct his attributive [fractional] * * * share of the costs of development and operation." Weinert's Estate v. Commissioner, supra, 294 F.2d at 758.[7]

Although neither the *Abercrombie* nor the *Prater* opinion clearly explains the rational of *Abercrombie*, a two-pronged argument has since been advanced to support the result. First, as the appellee argues here, it may be argued that the *Abercrombie* transaction was a loan from the carried to the carrying party of 1/16 of the funds necessary to develop and operate the wells. The loan could be repaid only out of the carried party's share of production. The production which went towards repaying any of the loan would be income to the carried party on the familiar theory that the nondonative payment of a debt by a third party is income to the debtor. Int.Rev.Code of 1954, § 61(a) (12).

The second prong of this argument distinguishes an *Abercrombie* situation from other carried interest cases by the situs of title. Unlike *Manahan*

---

7. The carrying party in *Prater* had outside financing and the carried party joined in a mortgage of the entire working interest to secure this financing. We held in part, "[I]f one has an economic interest in oil in place, neither the fact, that that interest is pledged to secure the return of advances made on his ac-

count by others, nor the fact, that the owner is not personally liable for the repayment of the advances, changes the legal situation as to the ownership of the interest and the income and the right to deduct the expenses attributable to his share." 273 F.2d at 125.

and *Herndon,* in *Abercrombie* and *Prater* the carried party did not assign to the carrying party either title to, or oil production payments from,[8] his retained portion of the working interest. Each gave the carrying party merely the right to recoup drilling and development costs out of production before making any payments to the carried party.[9]

■ Despite attempted distinctions, the *Abercrombie* and *Prater* holdings conflict with the view, taken in other carried interest transactions, that only income actually payable to the carried party is taxable to the carried party. Fundamental to both *Manahan and Herndon* is that no income which, under the carried interest agreement, is retained by the carrying party and used to recoup drilling and development costs (as opposed to operating expenses) is taxable to the carried party. Moreover, one year before *Abercrombie* the Supreme Court decided two cases, Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 1946, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062, 162 A.L.R. 827, and Kirby Petroleum Co. v. Commissioner of Internal Revenue, 1946, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343, which cast further doubt

on the loan-title rationale (although seemingly they were used for support in the *Abercrombie* opinion). These cases stated that for tax purposes an interest in net proceeds is a depletable interest in the oil; thus, receipt of such proceeds is taxable only to the recipient. Implicit in the *Burton-Sutton* opinion is the principle that before the break-even point is reached, gross income is reported by the one who, through the production contract, actually receives it.[10]

With this discussion of legal background, we turn to the facts of the present case.

## II.

The taxpayers, William H. Cocke, Sr., and Tula Stokes Cocke, his wife, and William H. Cocke, Jr., and Bula H. Cocke, his wife, were residents of Houston. The Cockes were involved in two agreements for the drilling and production of oil. We describe each briefly.

In the first, Cocke, Sr., R. H. Goodrich, and Humble Oil and Refining Company owned working interests in mineral leases and unleased mineral interests in St. Martin Parish, Louisiana, known as the "Goodrich K" properties.[11]

8. "It is clearly true, as already indicated, that an oil payment, like royalty, is an interest in property, an interest in realty, an interest in the minerals in place." Commissioner of Internal Revenue v. Hawn, 5 Cir. 1956, 231 F.2d 340, 343.

9. The distinction is skeptically stated in Breeding, supra, at 248:
 "The only distinction between the latter case [*Abercrombie*] and the other two [*Manahan* and *Herndon*], and this distinction seems more formal than real, is that in *Abercrombie* the assignor retained or held title to the working interest; whereas, the arrangement was accomplished in the other two cases by a temporary assignment of title."

10. According to Professor Hambrick, the only difference between the *Abercrombie* net profits interest and the net profits interest in *Burton-Sutton* was that the "carried party" in *Abercrombie* retained title to $\frac{1}{16}$ of the leasehold, while the assignor in *Burton-Sutton* had retained only a net profits interest. In fact,

Professor Hambrick argues that *Abercrombie* did not present a true carried interest at all, because the agreement in that case provided a *permanent* shift to the carrying party of the obligation to put up operating costs. His thesis is that a true carried interest terminates after a payout period during which the carrying party recoups the investment of drilling and development costs. After the recoupment, the carrying and carried parties are both responsible for costs of operating. Hambrick thus concludes that the *Abercrombie* agreement in reality provided for a $\frac{1}{16}$ net profits interest, per se the *Burton-Sutton* situation, in favor of the "carried party." Hambrick, "Another Look at Some Old Problems—Percentage Depletion and the ABC Transaction," 34 Geo. Wash. Law Review 1, 31-32 (1965).

11. According to the agreement, these properties consisted of (a) five mineral leaseholds of which Humble as lessee owned an undivided $\frac{1}{2}$ interest and Cocke and Goodrich the other half as

On October 12, 1955, Humble, Goodrich, and Cocke, Sr., entered into a joint operating agreement among themselves to accomplish the drilling and development of the Goodrich K properties. Humble was designated Operator, with control of exploration, drilling, and production of oil. Humble was given a 50 per cent interest in production. Goodrich and Cocke were designated non-Operators, and were each given a 25 per cent interest in production.

As Operator, Humble was obligated to advance all sums needed to conduct its operations and was entitled to recoup Operator's share of the advances from only one-half of the Non-Operators' 50 per cent share of production if any.[12]

Humble, then, had agreed to put up all of the money for drilling and production of the Goodrich K properties and to look only to one-half of the 50 per cent production interest of Goodrich and Cocke, Sr., for the proportionate share of the expenses to be borne by Goodrich and Cocke, Sr.

The second agreement concerns working interests in mineral leases and unleased mineral interests in Iberia Parish, Louisiana, known as the "Bayou Postillion" properties. These interests were owned by Humble, the California Company, Cocke, Sr., Cocke, Jr., and Goodrich.[13] To develop the Bayou Postillion properties these parties entered into an agreement among themselves on January 1, 1956. Humble was designated Operator and was given a 40.302 per cent interest in production. The California Company, a Non-Operator, was given a 48.06 per cent interest. Goodrich and the Cockes were given an 11.638 per cent interest among them. Humble and California were required to advance all the costs of drilling and development and could recoup the proportionate share of these outlays owned by Goodrich and the Cockes only from one-fourth of their proportionate interest of 11.638 per cent.[14]

lessees; (b) three mineral leases in which Humble was sole lessee and Cocke and Goodrich were lessors; and (c) an "unleased mineral interest" underlying the area, jointly owned by Goodrich and Cocke. Thus it will be noted that each of Humble, Cocke, and Goodrich had at least part of the title to some of the leaseholds and interests comprising the Goodrich K properties. The parties made no attempt in the agreement to allot production according to title.

12. Paragraph 6 of the Agreement reads in part as follows:
"Operator shall advance all monies necessary for conducting the operations hereunder and shall reimburse itself currently for Non-Operator's share of expenses and charges to the Joint Account out of one-half (½) of Non-Operator's proportionate interest in the current production."

13. According to the agreement, these properties consisted of (a) 44 mineral leaseholds with Humble as lessee; (b) three mineral leases with California as lessee; (c) one mineral lease with California and Humble as lessees; (d) two mineral leases with Goodrich and Cocke as lessees; (e) one mineral lease with Goodrich alone as lessee; (f) one mineral lease with Nat V. Collier (otherwise unidentified) as lessee; and (g) certain "unleased mineral interests" held by Cocke, Sr., Cocke, Jr., R. H. Goodrich, and H. R. Goodrich under specified lands. Again each of the parties to this agreement had at least part of the title to some of the leaseholds and interests comprising the Bayou Postillion properties. Again the parties made no attempt in the agreement to allot production according to title.

14. Item II of the agreement reads in part:
"Operator shall charge the Joint Account with all costs and expenses incurred in connection with the operation of the Joint Area as herein contemplated. * * * The charges made to the Joint Account as herein provided shall be borne by the parties hereto in the following manner:
"1. Goodrich and [the] Cocke[s] shall bear all costs in connection with the drilling of wells hereunder up to but not including the permanent tank batteries, in an amount equal to one-half of Goodrich and Cocke's proportionate interest. As to each well drilled hereunder, Humble and California shall advance Goodrich and Cocke's share of said costs, and shall be reimbursed only if such well be completed as a producer of oil, gas or other minerals, and then

In filing their respective tax returns for 1957 and 1958, taxpayers reported as income the sums which were used by Humble, under the two agreements, to pay taxpayers' share of the costs of drilling and development of the Goodrich K and Bayou Postillion properties. The taxpayers also claimed the following deductions: (1) percentage depletion based upon the proportionate share of proceeds of oil used by Humble to pay taxpayers' share of costs of drilling and development; (2) as expenses, similar proportionate shares of intangible drilling and development costs; (3) a similar proportionate share of depreciation of the amounts paid by Humble for tangible assets. Specifically, Cocke, Sr., and his wife reported the following income and deductions from the Goodrich K and Bayou Postillion properties for 1958:

| Item | Goodrich K Properties | Bayou Postillion Properties | Total Reported |
|---|---|---|---|
| Gross income | $13,986.18 | $6,978.21 | $20,964.39 |
| Lease operating expenses | 3,164.41 | 3,070.61 | 6,235.02 |
| Production taxes | 1,757.51 | 463.36 | 2,220.87 |
| Depreciation | 1,145.94 | 1,335.51 | 2,481.45 |
| Depletion | 3,846.20 | 1,722.12 | 5,568.32 |

Cocke, Jr., and his wife reported the following income and deductions from the Bayou Postillion properties for 1957:

| Item | |
|---|---|
| Gross income | $ 3,916.49 |
| Intangible development costs | 17,829.37 |
| Depreciation | 581.61 |
| Production taxes | 336.12 |
| Depletion | –0– |

The Commissioner disallowed all income, depletion, operating expenses, and depreciation claimed by taxpayers as attributable to those sums which Humble used for recoupment of its outlays for costs of drilling and development, on the theory that this income and these several deductions were attributable to Humble, and that the only income and percentage depletion attributable to taxpayers was that from such of their interest as was not used by Humble to recoup its costs and expenses.[15]

such reimbursement shall be only out of one-fourth of Goodrich and Cocke's proportionate interest. With respect to each well completed as a producer hereunder, all costs incurred in connection therewith subsequent to such completion, shall be borne by Goodrich and Cocke in an amount equal to the proportionate interest of Goodrich and Cocke in the Joint Area, provided, however, that Humble and California shall advance Goodrich and Cocke's share of all such costs, and shall be reimbursed only out of one-fourth of Goodrich and Cocke's proportionate interest in such well.

"2. Humble and California shall each be responsible for its proportionate part of all cost incurred in connection with the drilling of wells hereunder, up to but not including the permanent tank batteries, and, in addition thereto, shall bear equally such cost in an amount equal to one-half of the proportionate interest of Goodrich and Cocke. As to costs incurred subsequent to completion of a well producing or capable of producing oil, gas or other minerals. Humble and California shall only bear such costs in proportion to their proportionate interest herein.

"Operator shall on behalf of the parties hereto initially pay and discharge all cost and expenses incurred in the development and operation of the Joint Area, and shall keep such area free and clear of all liens growing out of its operations hereunder, provided, however, that California shall, if requested by Humble, advance its part (determined in the manner immediately above set out) of the anticipated development and operating cost and expenses. * * * *"

15. The income and expenses claimed by Cockes but disallowed by the Commis-

The Commissioner determined that only the following income and expenses should have been reported on the return of Cocke, Sr., for 1958:

| Item | Goodrich K Properties | Bayou Postillion Properties | Total |
|---|---|---|---|
| Gross income | $7,871.89 | $5,233.66 | $13,105.55 |
| Lease operating expenses | –0– | –0– | –0– |
| Production taxes | 989.75 | 347.52 | 1,337.27 |
| Depreciation | –0– | –0– | –0– |
| Depletion | 1,164.77 | 1,439.27 | 3,604.04 |

The Commissioner further determined that only the following income and expenses should have been reported on the return of Cocke, Jr., for 1957:

| Item | |
|---|---|
| Gross Income | $3,916.49 |
| Intangible development costs | –0– |
| Depreciation | –0– |
| Production taxes | 336.12 |
| Depletion | 1,077.03 |

Based upon his computations the Commissioner assessed additional taxes and interest for the returns in question. Taxpayers paid the assessments and filed suit for refund in district court. The government's announced defense to this refund suit was that the case of Commissioner of Internal Revenue v. J. S. Abercrombie Co., supra, was no longer valid. The district court, relying on *Abercrombie*, gave judgment for the taxpayers. W. H. Cocke v. United States, S.D.Tex.1966, 263 F.Supp. 762.

A comparison of the facts in *Abercrombie* and of the present case shows that, essentially, the present case presents again the precise issues of *Abercrombie*, with one exception, which we deem without substance.[16] In both cases the carrying parties agreed to finance the drilling and development costs by themselves, and to look only to production for recoupment of these costs. In both cases, the carried parties were not personally liable for the drilling costs, but agreed to allow the carrying parties to recoup all of the drilling and development costs before receiving their full share of payments (in money or oil) out of production. In other words, in each case the carrying party agreed to bear all of the risk of drilling and development, and the carrying party agreed to subordinate its interest in production to the repayment of the carrying party's outlays. In neither case did the carried party assign its entire portion of the working interest (as in *Manahan* transactions) or an oil production payment (as in *Herndon* transactions) to the carrying party for the duration of the recoupment period.

### III.

We have concluded that our own cases, both earlier and later than *Abercrombie*, cases of other courts on the same or related subjects, and the sound policy of taxing according to the substance of a transaction rather than its form, all in-

---

sioner were claimed by Humble on its return, and as such were allowed by the Commissioner.

16. In *Abercrombie*, the carried party originally held the entire working interest, granted a portion of it to the carrying party in return for the obligation to drill, etc. Here, the carried and carrying parties were existing co-owners of the working interest when the carrying party took on his obligations. The distinction is without significance. Breeding and Burton, Income Taxation of Oil and Gas Production ¶2.08 at p. 207 (1961); Ryan "The Carried Interest in the Fifth Circuit, or, Is *Abercrombie* Dead," 4 Houston Law Review 477, n. 1 (1966).

struct us to disapprove of *Abercrombie* and of the taxpayer's position here.

"The principle of looking through form to substance is no schoolboy's rule; it is the cornerstone of sound taxation, especially of oil and gas transactions which do not fit snugly into common law conveyancing forms." Weinert's Estate v. Commissioner of Internal Revenue, supra, 294 F.2d at 755. Common law property concepts may aid in identifying certian interests, but they are not crystallizations of an absolute truth. Pedantic adherence to medieval enfeoffments—which are relics of an age of surface use of lands and are alien to vertical and subterranean ownerships—is worthless and indeed harmful. It requires the same fictionalizing and logic-chopping which became notorious during the attempts to fit new causes of action into the old forms of action. Success in such endeavors is as fugacious as the oil and gas in question.

The Supreme Court realized, as early as 1925, that the right to depletion deductions was not limited to those who had "title" in the deposits.

"It is said that the depletion allowance applies to the physical exhaustion of the ore deposits, and since the title thereto is in the lessor, he alone is entitled to make the deduction. But the fallacy in the syllogism is plain. The deduction for depletion in the case of mines is a special application of the general rule of the statute allowing a deduction for exhaustion of property. While respondent does not own the ore deposits, its right to mine and remove the ore and reduce it to possession and ownership is property within the meaning of the general provision. Obviously, as the process goes on, this property interest of the lessee in the mines is lessened from year to year, as the owner's property interest in the same mines is likewise lessened. There is an exhaustion of property in the one case as in the other. Lynch v. Alworth-Stephens Co., 1925, 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed 660.

In Burnet v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed 199, the Court again ruled that the "economic consequences," rather than the conclusory characterizations of local land law, govern the taxation of a bonus paid for a mineral lease.

Palmer v. Bender, 1933, 287 U.S. 551, 555–556, 53 S.Ct. 225, 226, 77 L.Ed 489, 492, is recognized today as having swept away distinctions based upon "formal attributes of [the legal instruments in question] or the descriptive terminology which may be applied to them in the local law" in determining who has a depletable interest in minerals. The Court instated the "economic interest" principle instead. We repeat what we first quoted in Weinert's Estate, 294 F.2d at 755: "[T]he office of the economic interest [is] to identify the party to whom benefits and burdens attendant to mineral production are to be attributed for tax purposes." See also Branscomb, "Recent Developments in Oil and Gas Taxation," 11th Annual Oil and Gas Institute of the Southwest Legal Foundation 615, 617 (1959).

In two pre-*Abercrombie* cases, this Court followed the realistic concept. In Ortiz Oil Co. v. Commissioner of Internal Revenue, 5 Cir. 1939, 102 F.2d 508, Ortiz wished to exercise options which it held to acquire and develop certain oil property. Westbrook and Thompson agreed to furnish Ortiz sufficient money to buy the property and to drill, in return for the promise by Ortiz to repay Westbrook and Thompson, with high interest, out of proceeds from production of the wells to be drilled on the land in question. Ortiz claimed that the transaction was a loan, and that the funds repaid were income to it, with deductions for depletion and interest. We held that the transaction was a sale of oil in place and that the money furnished by Westbrook and Thompson was not a loan.

"It was a cash consideration for a conveyance of stipulated proportions of oil production to the extent in value of $359,333.34 if, as, and when the oil was produced. The portions of production specified belonged to and consti-

tuted property of Westbrook and Thompson and the petitioner was only obligated to pay over and account to them when and if the oil was produced. If no oil was produced Westbrook and Thompson got nothing and Ortiz Oil Company was under no obligation to pay them anything. The undertaking was in no sense a joint venture. Petitioner was to manage, develop, and operate the properties and pay all expenses. The contract is clear in this regard.

"Westbrook and Thompson were entitled under the contract to receive specified proportions of the proceeds of oil sales or to take their actual share of the oil production. They simply acquired an interest in oil in place. The right to share in the oil produced constituted· an economic interest in the properties to the extent of the amount agreed upon. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489."

102 F.2d at 509. We emphasized in *Ortiz* that Westbrook and Thompson had agreed to look only to the possible production, and that Ortiz was not "personally" liable on the obligation. A similar line of reasoning was advanced in the second case, Commissioner of Internal Revenue v. Caldwell Oil Corp., 5 Cir. 1944, 141 F.2d 559.

In Wood v. Commissioner of Internal Revenue, 5 Cir. 1960, 274 F.2d 268, we had before us what the dissent in that case called "a typical *Abercrombie* situation." There the taxpayer was a Texas divorcee who had been awarded in the divorce decree one-half of the community's 45 per cent interest in certain oil and gas production, the interest becoming payable to her after the payment of certain community debts. The taxpayer was not personally liable for the debts, and proceeds of production had been assigned to pay them. The Commissioner contended that the payment of these debts was a benefit to the taxpayer and therefore income to her. We rejected this contention, emphasizing the state court's characterization of the taxpayer's interest as a reversionary interest without

"title" until the debts were paid. The Court's refuge from *Abercrombie* was a finding of no title, but the dissent showed this to be a vulnerable sanctuary.

The facts of Weinert's Estate v. Commissioner of Internal Revenue, 1961, 294 F.2d 750, did not require the overruling of *Abercrombie*, but in our discussion of the legal issues we noted that *Abercrombie* need be narrowly read in order not to conflict with *Weinert*. Weinert owned a working interest in certain oil and gas properties. He agreed to sell to Lehman one-half of this interest, plus a $50,000 production payment out of the proceeds of his retained half. Lehman agreed, in return, to pay Weinert $100,000 cash, and to drill and develop the oil property. In addition, Lehman agreed to "loan and advance" up to $150,000 to pay Weinert's "share" of the drilling and development costs. However, Weinert was not personally liable on this obligation. Repayment, indeed, was accomplished in the following fashion: Weinert assigned his retained half of the working interest to a trustee. The trustee was instructed to pay to Lehman any excess of proceeds from production over Weinert's share of operating costs. These payments to Lehman were to liquidate the $150,000 obligation (plus two per cent interest) and then the $50,000 production payment. When these had been paid, the trustee and Lehman were to reassign the interest to Weinert. The Commissioner claimed that sums paid to liquidate the $150,000 "indebtedness" were income to Weinert. We held otherwise, and the principles expounded in *Weinert* (including references to our earlier cases above stated) plus related Supreme Court cases will, in Section IV of this opinion, be used to dispose of the issues of the present case. Our chronological survey concludes with the Ninth Circuit's decisive attack on the very foundation of the *Abercrombie* doctrine.

In United States v. Thomas, 9 Cir. 1964, 329 F.2d 119, the taxpayers, operating under the name Quality Oil Company, entered into an operating agreement with Richfield Oil Company. Under the agree-

ment Quality held title to an undivided interest in certain leases, but Richfield was granted the sole right to drill, develop, and operate the property. Richfield's burden of operation and Quality's obligation of reimbursement closely resembled the agreement at bar, and in fact the Thomases claimed to have an *Abercrombie* "carried interest." We quote from the *Thomas* opinion:

"Appellees contend they have a 'carried interest' in the oil and gas in place.

"In support of such contention appellees rely on the following cases: Reynolds v. McMurray, 60 F.2d 843 (10th Cir. 1932) C.D. 287 U.S. 664, 53 S.Ct. 222, 77 L.Ed. 573; Helvering v. Armstrong, 69 F.2d 370 (9th Cir. 1934); T. K. Harris Company v. Commissioner, 112 F.2d 76 (6th Cir. 1940); Commissioner v. J. S. Abercrombie, 162 F.2d 338 (5th Cir. 1947); Prater v. C.I.R., 273 F.2d 124 (5th Cir. 1959).

"While the legal relationship between Richfield and Quality, viewed from the standpoint of property law concepts is, in form, that of co-owners of the working interest in the leases involved, the Supreme Court in the cases above cited has made it clear that legal title and property law concepts alone are not determinative of the party who has an economic interest in the working interest. In the area of taxation economic realities determine tax consequences. * * *

"In our view the substance and effect of the legal arrangement between Richfield and Quality is that Quality assigned to Richfield, at the beginning of the legal relationship, so much of Quality's oil and gas in place as would be needed during the term of that relationship to reimburse Richfield for Quality's portion of the development and operating expenses, and thus retained not an economic interest in the working interests of the leases but in reality only a 'net profits' interest. The fact that the proceeds from production in the years in question exceeded the cost of development and opera-

tion expenses incurred during those years does not alter the fact that Richfield bore the risk and burden of Quality's share of the expenditures and looked solely to production for recoupment.

"We concede that the holdings in the cases relied upon by appellees support their contentions.

"The holdings in McMurray, Armstrong and Harris are based primarily, if not wholly, upon property law concepts, and the opinions in those cases give no consideration to the 'economic interest' concept as developed in many of the Supreme Court cases above cited. Likewise Abercrombie and Prater rely upon property law concepts and resort to legal fictions which were severely criticized by a recent decision of the same Circuit [citing the *Weinert* case in a footnote], and their precedential value was largely undetermined.

"We are in no position to overrule any of the cases relied upon by appellees except the Armstrong case. We believe that the vitality of that case has been sapped by the above cited decisions of the Supreme Court and we expressly overrule the decision in Armstrong." 329 F.2d at 130–131.

The taxpayers at bar point to a distinguishing factor in the *Thomas* case in that the Thomases obtained no interest in any of the equipment or improvements. The distinction is without substance in light of the Ninth Circuit's clear pronouncements of law, its specific overruling of a prior case of theirs upon which we had relied in *Abercrombie* for support, and its critical comments on *Abercrombie* itself. .

## IV.

■■■ A. Title is not controlling. We said in *Weinert:*

"The difficulty in applying Abercrombie to sharing arrangements generally is that, however correct the decision may have been on the facts before the Court, the statements in the opinion emphasizing the common law concept

of ownership tend to weaken the tax concept of economic interest, so important in oil and gas taxation—to the Government as well as to taxpayers. If Abercrombie is interpreted too broadly, it will discourage sharing arrangements created out of the exigencies of the oil and gas business and necessary, in many cases, to development of oil and gas property. 294 F.2d at 756."

We add Professor Hambrick's assessment of *Abercrombie* for our *coup de grace:*

"Whatever uncertainties may remain in the wake of the Supreme Court's landmark decisions on depletion, they do not include the proposition that the ownership of a legal interest in oil and gas or other mineral in place determines the income share of the owner or his allowance for depletion, where by contract or otherwise the economic value has been transferred to another. Hambrick, "Another Look at Some Old Problems—Percentage Depletion and the ABC Transaction," 34 Geo.Wash. Law Review 1, 32 (1965)."

This conclusion is correct; virtually every Supreme Court case touching on the issue has eschewed title as a deciding factor. Lynch v. Alworth-Stephens Co., supra; Burnet v. Harmel, supra; Palmer v. Bender, supra; Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Kirby Petroleum Co. v. Commissioner of Internal Revenue, 1946, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343; Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 1946, 350 U.S. 308, 76 S.Ct. 395, 10 L.Ed. 347. The reason for this position is clear. "Title" is a collocation of right. It is a legal conclusion. The several rights which make up title vary from state to state, and are not always relevant to tax litigation. The owner of title may divest himself of title without losing any rights, such as by placing title in a trustee as was done in *Weinert.* Title is relevant in tax litigation only insofar as significant benefits or burdens accompany it. It is easier, less dangerous, and more nearly accurate to speak of these relevant benefits and

burdens individually than it is to lump them uncertainly together and deal with them as "title." Cf. Justice Holmes' famous remark in Corliss v. Bowers, 1930, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916, 917: "[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." Cf. also Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

■ In the present case the relevant issue is whether the carrying party had "an economic interest in * * * the oil * * *. By this is meant only that under his contract he must look to the oil in place as the source of the return of his capital investment. The technical title to the oil in place is not important." Kirby Petroleum Co. v. Commissioner of Internal Revenue, supra, 326 U.S. at 603, 66 S.Ct. at 411, 90 L.Ed. at 348. Sneed, "The Economic Interest—An Expanding Concept," 35 Texas Law Review 307 (1957).

We reject the notion that title controls, and we pass to the real issue here.

■ B. We hold that taxpayers here had no economic interest in the oil which produced the income questioned here.

"Under Palmer v. Bender two elements constitute the requirement of an economic interest. First, the taxpayer must have acquired by investment an interest to the minerals in place. Second, 'he must look for a return of his capital' to the 'income derived from the extraction of the oil'—by 'any form of legal relationship.'

"The issue is an economic one. The stake in the minerals is what counts: the income from oil and gas is taxable to the man who risks his stake to produce oil and gas. Weinert's Estate, 294 F.2d at 756.

We held in Weinert that the agreement to "loan and advance" the $150,000 for Weinert's share of drilling and development costs was in fact not a loan, but a

sharing arrangement. We emphasized, citing Ortiz Oil Co. v. Commissioner of Internal Revenue, supra, that the carried party was not risking anything, and was not liable for repayment if the wells did not produce. The same substance is true here. Humble did not look to the Cockes for repayment of the outlays; it looked only to the oil which its outlays might or might not produce. Its stake was in the minerals in the ground and not in the credit rating of the taxpayers here. Its risk was economic, and its interest was an economic interest.

> "This opportunity of converting a right to develop the possibility of oil into property is the only ownership of minerals that has tax significance; bare ownership in place of minerals 12,000 feet underground, or perhaps not there at all, or if there perhaps not exploitable, has little if any real meaning— or should have little meaning for income tax purposes. It is the development of this opportunity into producing wells having a present economic usefulness that results in income values. That is the teaching of Palmer v. Bender." Weinert's Estate, 294 F.2d at 762.

We think that the present direction of Palmer v. Bender is illustrated by Commissioner v. Southwest Exploration Co., 1956, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347. There, the taxpayer had contracted to develop certain oil deposits lying off the coast of California. However, California law prohibited the drilling of such wells except on filled land (at the time unavailable) or by slant-drilling from upland sites. Taxpayer therefore contracted with an owner of uplands, agreeing to pay such owner 24½ per cent of net profits. The taxpayer sought to claim the depletion allowance on the upland owner's share of the profits. The Supreme Court, citing the economic interest test in Palmer v. Bender, supra, held that because the upland owner had made an essential contribution to production by providing the only site possible for drilling, the upland owner had gained an economic interest in the oil in place and was entitled to the depletion allowance.

## V.

■ Though both the government and the Cockes urge upon us the sodality of a unified triumvirate of depletion, depreciation, and intangible drilling and development costs, we have quested for any difference among them which would yield different results in this case. We now conclude, however, that depreciation and intangible drilling and development costs are subservient satellites of depletion in situations involving carried interests, and that, as the spoils go to the victor, so these deductions go to the rightful depleter.

■ It is rather elementary taxation that the statutory right to depreciation does not necessarily follow legal title. Helvering v. F. & R. Lazarus & Co., 1939, 308 U.S. 252, 60 S.Ct. 209, 84 L. Ed. 226. See also W. H. Armston Co. v. Commissioner of Internal Revenue, 5 Cir. 1951, 188 F.2d 531, 533–534; Commissioner of Internal Revenue v. Moore, 9 Cir. 1953, 207 F.2d 265, 268–269, cert. den., 1954, 347 U.S. 942, 74 S.Ct. 637, 98 L.Ed. 1091; First National Bank of Kansas City v. Nee, 8 Cir. 1951, 190 F.2d 61, 68, 40 A.L.R.2d 423. To take depreciation a taxpayer must also have an investment or basis in the equipment. Detroit Edison Co. v. Commissioner of Internal Revenue, 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286; United States v. Georgia Railroad and Banking Co., 5 Cir. 1965, 348 F.2d 278, 288 (fn. 25 and accompanying text), cert. den., 1966, 382 U.S. 973, 86 S.Ct. 538, 15 L.Ed.2d 465; 4 Mertens, Federal Income Taxation §§ 23.19 and 23.21.

A carried party, however, spends none of his funds for equipment. His only claim to basis is through the fictional "loan" whose substance fades with the passing of *Abercrombie*. As Judge Wisdom observed in his dissenting opinion in Prater v. Commissioner of Internal Revenue, 5 Cir. 1959, 273 F.2d at 126–127:

> "Putting aside fictions, the plain fact is that there is no loan or pledge or

charge equivalent to payment in cash —when the taxpayer has no firm obligation to repay the carrier's advances (should there be insufficient production) and the carried interest has no value (if there should be no production)."

In essence the Cocke and Humble relationship is indistinguishable from that found in United States v. Thomas, 9 Cir. 1964, 329 F.2d 119, discussed in Section IV, supra. The Cockes made no payment for, and thus had no investment in, the depreciable property. Therefore, while unlike the Thomases, they possessed legal title to the depreciable property, like the Thomases, they could not claim any depreciable interest. Putting it another way, their interest in that property, for tax purposes, had a basis of zero.

■■■■ Our discussion of intangible drilling and development costs will begin with another general tax principle, that deductions for expenses can be taken only by the party who actually "paid or incurred" them. See 26 U.S.C. § 162; [17] 26 U.S.C. § 212; [18] Helvering v. Price, 1940, 309 U.S. 409, 413, 60 S.Ct. 673, 675, 84 L.Ed. 836, 839; Eckert v. Burnet, 1931, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911. "There are no provisions in the tax laws whereby one taxpayer can deduct from his gross income expenses incurred and defrayed by another." H. W. Nelson Co. v. United States, 1962, 308 F.2d 950, 954, 158 Ct.Cl. 629. The focal word "incurred" is likewise present in the Treasury Regulation concerning intangible drilling and development costs:

"1.612–4(a). Option with respect to intangible drilling and development costs. In accordance with the provisions of section 263(c) [see Appendix, infra], intangible drilling and development costs *incurred* by an operator * * * in the development of oil

and gas lease properties may at his option be chargeable to capital or to expense." (Emphasis added).

■■■■ "Incur" has substantiality and strong kinetics and does not embrace a contingent charge on a hoped-for asset over which the taxpayer has no present authority or control. See United States v. St. Paul Mercury Indemnity Co., 8 Cir., 1956, 238 F.2d 594, 598 (and authority cited therein); American Hotels Corp. v. Commissioner of Internal Revenue, 2 Cir. 1943, 134 F.2d 817, 819. At the time that moneys were expended by Humble for intangible drilling and development costs, the Cockes were financially passive, not to be heard unless and until Humble's operation was successful. Moreover, during the reimbursement period tax consequences for all moneys received by Humble were, as we have held, attributable to Humble. Intangible drilling and development costs prove no exception to our now-consistent rule that the carried interest arrangement "reallocates, temporarily, the benefits and burdens of developing and operating an oil lease * * *." Weinert's Estate v. Commissioner of Internal Revenue, 5 Cir. 1961, 294 F.2d 750, 757. See also Bennion, "Intangible Drilling and Development Costs: The Final Regulations," Fifteenth Annual Tulane Tax Institute 665 (1966).

## VI.

The passing of *Abercrombie* into historical desuetude is not without its jurisprudential complications. Thus, it has been suggested, first, that to overrule *Abercrombie* would violate the canons of stare decisis and, second, that if we must overrule *Abercrombie*, we should do so prospectively in order to relieve the abrasive overtones of a change in law. We pause to consider both suggestions.

---

17. § 162. *Trade or business expenses*
 (a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses *paid or incurred* during the taxable year in carrying on any trade or business, including * * *." (Emphasis added.)

18. § 212. *Expenses for production of income.*
 In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses *paid or incurred* during the taxable year * * *." (Emphasis added.)

 Our law is neither moribund nor muscle-bound. There are justifiable escapes and liberations from the rigidities and inflexibilities of stare decisis.[19] We repair to the wisdom of Cardozo when he wote:

"Through one agency or another, either by statute or by decision, rules, however well established, must be revised when they are found after fair trial to be inconsistent in their workings with an attainment of the ends which law is meant to serve. The revision is a delicate task, not to be undertaken by gross or adventurous hands, lest certainty and order be unduly sacrificed, yet a task also not to be shirked through timidity or sloth." Cardozo, The Growth of the Law 120 (1924).

Moreover, our reapprisal of carried interest taxation need have no agonizing overtones because it has been presaged.[20] In this respect our present position is remarkably similar to that of the Second Circuit in Chappell & Co. v. Frankel, 2 Cir. 1966, 367 F.2d 197 (concerning the rule on appealability of an order denying summary judgment). Sitting en banc and speaking through Judge Waterman, that Court said:

"We recognize that though we are privileged in accord with the genius of the common law to decide cases on a case-by-case basis it 'does not relieve us of the judicial obligation to pay proper heed to precedent: the question still is not what we would hold if we now took a fresh look but whether we should take that fresh look' * *. On the other hand the doctrine of *stare*

19. We note with interest that on July 26, 1966, the House of Lords proclaimed that in the future it would "no longer regard itself as absolutely bound by its own precedent decisions." 82 Law Quarterly Review 441 (October, 1966).

20. United States v. Thomas, 9 Cir. 1964, 329 F.2d 119; Weinert's Estate v. Commissioner of Internal Revenue, 5 Cir. 1961, 294 F.2d 750. See also Ryan, "The Carried Interest in the Fifth Circuit, or, is Abercrombie Dead?", 4 Houston L.Rev. 477 (1966); Bennion, "Intangible Drilling and Development Costs: The Final Regulations," Fifteenth Annual Tulane Tax Institute 665, 676–82 (1966); Hambrick, "Another Look at Some Old Problems—Percentage Depletion and the ABC Transaction," 34 Geo.Wash.L.Rev. 1, 31–32 (1965); Caplan, "Taxation of Carried Interests: A study in Gossamer Distinctions," 7 So.Texas L.J. 239 (1964); Appleman, "Oil and Gas Tax Law—1964 Critique," Southwestern Legal Foundation Fifteenth Annual Institute on Oil and Gas Law and Taxation 457, 469–74 (1964); "The trend in Carried Interest Cases," 17 SW.L.J. 242 (1963); Shoenbaum, "Significant Federal Tax Developments Affecting Oil and Gas," Southwestern Legal Foundation Thirteenth Annual Institute on Oil and Gas Law and Taxation 481–86 (1962); Bean, "Taxation of Carried Interest in Oil and Gas Transactions—In Retrospect and Prospect," 10 Kansas L.Rev. 391 (1962); Note, 22 La.L.Rev. 685 (1962); 12 Oil and Gas Tax Q. 41 (1962); 11 Oil and Gas Tax Q. 233 (1962); 11 Oil and Gas Tax Q. 81 (1962); Hambrick, "A New Look at the Carried Interest," Tenth Annual Tulane Tax Institute 304 (1961); 10 Oil and Gas Tax Q. 108 (1961); Galvin, "The 'Ought' and 'Is' of Oil-and-Gas Taxation," 73 Harvard L. Rev. 1441, 1492–94 (1960); Branscomb, "Recent Developments in Oil and Gas Taxation," Southwestern Legal Foundation Eleventh Annual Institute on Oil and Gas Law and Taxation 615, 633–41 (1960); 9 Oil and Gas Tax Q. 222 (1960); Peck, "Recent Developments in Oil and Gas Taxation," Southwestern Legal Foundation Tenth Annual Institute on Oil and Gas Law and Taxation 421, 458–61 (1959); 8 Oil and Gas Tax Q. 238 (1959); Bullion "A New Look at Tax Aspects of Oil and Gas Sharing Arrangements," Southwestern Legal Foundation Eighth Annual Institute on Oil and Gas Law and Taxation 603 (1957); Winstead, "Carried Interests and Net Profits Interests," Southwestern Legal Foundation Second Annual Institute on Oil and Gas Law and Taxation 517 (1951); See also Breeding and Burton, Income Taxation of Oil and Gas Production §§ 2.08, 8.15 (1961 ed.); Paulston, "Tax Consequences of 'Net Interests' in Oil and Gas Transactions," P-H Oil and Gas Taxes ¶ 1009, 1009.8; Branscomb, "Allocating Income in Carried Interests," P-H Oil and Gas Taxes ¶ 2023. Additional authority is cited in Weinert's Estate, supra, 294 F.2d at 755–56 (fn. 11).

*decisis* has never been thought to limit a court's power to 'take a fresh look' in appropriate instances * * *. [T]he rule of our circuit has commanded no following in other federal courts of appeals and has been much criticized by the commentators. This unfavorable reaction to our earlier decisions has led us to the ' * * * strong * * * view that the challenged precedent is probably wrong * * *.'" 367 F.2d at 200–201.

We now essay the question of prospection versus retroaction. The Cockes, who view the impending demise of *Abercrombie* with understandable exacerbation, beseech us to immunize them from any change by making our decision purely prospective.[21] Moreover, the long history of judicial and Internal Revenue service ambivalence in this area gives some validity to their plea. Judicial inclination toward title-loan concepts began in three carried interest cases well before *Abercrombie*. Reynolds v. McMurray, 10 Cir. 1932, 60 F.2d 843, cert. den., 287 U.S. 664, 53 S.Ct. 222, 77 L.Ed. 573; Helvering v. Armstrong, 9 Cir. 1934, 69 F.2d 370; T. K. Harris Co. v. Commissioner of Internal Revenue, 6 Cir. 1940, 112 F.2d 76. In 1941, however, the Service (then the "Bureau of Internal Revenue") published its opus ruling on mineral taxation, General Counsel's Memorandum (G.C.M.) 22730, and expressed disagreement with the principles of the Reynolds v. McMurray decision, supra. Adopting the view that a carried interest is similar to a net profits interest, the Service concluded that the owner of a carried interest is not taxed upon income therefrom until such income is received.[22] The Tax Court's opinion in *Abercrombie*, which was filed on June 12, 1946, was inconsistent with G.M.C.

22730, and shortly thereafter the Service filed a nonacquiescence. 1946–2 Cum. Bull. 6. But in 1949, two years after our Court had affirmed the Tax Court in *Abercrombie*, the Service withdrew its non-acquiescence. 1949–1 Cum.Bull. 1. During the same year a district court in our Circuit followed *Abercrombie* and held for the taxpayer. Foster v. United States, S.D.Tex.1949, 85 F.Supp. 447. No appeal was taken by the government.

It was in light of the above judicial and administrative decisions that the Cockes, in 1955 and 1956, executed the contracts involved in this case. Three years later the carried interest controversy arose again when the Service attempted to restrict *Abercrombie* and to exclude the application of title-loan concepts in deductions for operating losses. The attempt failed. Prater v. Commissioner of Internal Revenue, 5 Cir. 1959, 273 F.2d 124.

On April 29, 1960, the Service published notice of the adoption of tax regulations, one of which would have completely abrogated the *Abercrombie* rule. 25 Federal Register 3761 (1960). When these regulations were finally promulgated in 1965, T.D. 6836, 1965–2 Cum. Bull. 182, the anti-*Abercrombie* regulation had been eliminated. Moreover, in 1961 the Service itself even relied on *Abercrombie* in the case of *Weinert's Estate*. We quote from the opinion in that case:

> "Before this Court the Commissioner relies: (1) on Abercrombie and Prater to show that the carrying party's advances were a loan; * * *" 294 F.2d at 752.

In 1963 "the Service returned to the path of righteousness, never more to roam, we hope,"[23] and reinstated its 1946 non-acquiescence with *Abercrombie*.

---

21. "A ruling which is purely prospective does not apply even to the parties before the court." Linkletter v. Walker, 1965, 381 U.S. 618, 622, 85 S.Ct. 1731, 1733, 14 L.Ed.2d 601.

22. G.C.M. 22730, 1941–1 Cum.Bull. 214, 223–24. "The policy adopted in GCM 22730, 1941–1 Cum.Bull. 214 and GCM

24849, 1946–1 Cum.Bull. 66 embodies the Manahan-Herndon approach." Weinert's Estate, supra, 294 F.2d at 757 (fn. 14).

23. Hambrick, "Another Look At Some Old Problems—Percentage Depletion and the ABC Transaction," 34 Geo.Wash.L.Rev. 1, 31 (fn. 115) (1965).

1963–2 Cum.Bull. 6 (see specifically fn. 18 at p. 7). Finally, in 1964 the Ninth Circuit decided the *Thomas* case, which we have discussed in prior sections of this opinion.

As has been shown, consistency in regard to *Abercrombie* has not been the guiding star of the Service or of the courts. Stressing this inconsistency, the Cockes argue that we should not apply our present ruling to their contract because such contract had been executed during a period of calm, marked by approvals of *Abercrombie* by both our Court and the Service. Our rejection of this estoppel line of argument is due to both a disinclination to accept the factual premise and a demurrer as to the law of prospectivity.

The Service maintains that, despite its 1949 formal acquiescence, it has never embraced the *Abercrombie* doctrine and has, in fact, worked consistently toward an erosion of that doctrine. Most commentators agree. In 1961 Judge Wisdom commented in Weinert's Estate, supra, 294 F.2d at 756–757:

"We interpret Abercrombie narrowly, as indeed, the Service—prior to the instant case—has consistently interpreted it."

A footnote to the above comment contains both a history of Service reaction to *Ab*-ercrombie and three excerpts from leading commentators. We will repeat only the last:

"After the affirmance by the Court of Appeals the Commissioner's non-acquiescence in the Tax Court's decision was withdrawn. However, in spite of the withdrawal the Service's policy is to restrict the application of *Abercrombie* narrowly to cases involving similar facts. Indeed, from all indications, it would not be surprising if the Service were to refuse to apply the *Abercrombie* principle to an exactly similar factual situation unless the taxpayer's name were also J. S. Abercrombie Co. Peck, "Recent Developments in Oil and Gas Taxation," Southwestern Legal Foundation Tenth Annual Institute on Oil and Gas Law Taxation 421, 459 (1959).[24]

A subsurface view of the supposed calm, then, convinces us that the Service, though formally quiescent, had let it be known that *Abercrombie* was not in favor. We must assume that the Cockes, if they knew about and were concerned with the *Abercrombie* doctrine, also knew the likelihood of further Service attacks upon that doctrine.

Under Section 7805(b) of the Code the Service can enforce the withdrawal of an acquiescence either retro-

---

24. Judge Wisdom also maintained in *Weinert's Estate* that the application of "economic realities" in taxation of oil and gas "is in harmony with the administrative position on the allocation of income and deductions in sharing arrangements, a position that since the publication of GCM 22730, 1941–1 Cum.Bull. 214, has been relatively stable." 294 F.2d at 752. One commentator has been even more emphatic: "It is to the great credit of the Service that it has with a considerable degree of consistency sought the demise of the *Abercrombie* principle ever since the publication of its well-reasoned ruling in G.C.M. 22730, 1941–1 C.B. 214, 223–224." Bennion, "Intangible Drilling and Development Costs: The Final Regulations." Fifteenth Annual Tulane Tax Institute 665, 682 (1966). Finally, we note Professor Hambrick's amusing account of the Service's frustrations and its pragmatic approach: "The Internal Revenue Service was given a bad time by the *Abercrombie* decision. It was in conflict with the Service's master-work on depletion and the division of income from the exploitation of natural resources deposits. G.C.M. 22730, 1941–1 Cum.Bull. 214. At the same time G.C.M. 22730 was out of step with the decisions in *Kirby Petroleum* and *Burton-Sutton* on the status of a net profits interest. At first the Service noted its formal disagreement with Abercrombie, nonacq., 1946–2 Cum. Bull. 6. Later, apparently in order to put itself in a 'compromising' position (to settle other similar cases in the same circuit) and still remain an 'honest woman,' the Service entered on the record its acquiescence, 1949–1 Cum.Bull. 1. Finally, the Service returned to the path of righteousness, never more to roam, we hope, nonacq., 1963–1 Cum.Bull. 5." Hambrick, supra, note 23.

actively or prospectively,[25] and it is now clear that the Service has broad discretion as to the application of Section 7805 (b). Dixon v. United States, 1965, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223; Automobile Club of Michigan v. Commissioner of Internal Revenue, 1957, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746. We quote from the Court in Dixon, supra, 381 U.S. at 79–80, 85 S.Ct. at 1308.

"Insofar as petitioners' arguments question the policy of empowering the Commissioner to correct mistakes of law retroactively when a taxpayer acts to his detriment in reliance upon the Commissioner's acquiescence in an erroneous Tax Court decision, their arguments are more appropriately addressed to Congress. Congress has seen fit to allow the Commissioner to correct mistakes of law, and in § 7805 (b) has given him a large measure of discretion in determining when to apply his corrections retroactively. In the circumstances of this case we cannot say that this discretion was abused."

To be sure, courts can enforce prospectivity upon a Service ruling in order to prevent discrimination or substantial injustice. See International Business Machines Corp. v. United States, 1965, 343 F.2d 914, 170 Ct.Cl. 357, cert. den., 1966, 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540, wherein the Service had attempted to charge retroactively an excise tax against I. B. M. machinery during the same years that it had exempted, by prospective ruling, I. B. M.'s sole competitor in the particular industry, Remington Rand. But see Bookwalter v. Brecklein, 8 Cir. 1966, 357 F.2d 78, which distinguishes and limits the I. B. M. case. See generally 2 Davis, Administrative Law §§ 17.01–17.09 (Chapter 17: "Estoppel and Stare Decisis") (1958). As to Service discretion, however, the facts in Dixon bear close resemblance to the facts at bar.

■■■■■■■ Turning finally to judicial prospectivity, we reserve for a more propitious and and compelling case a decision on the constitutional inhibition against prospective effectuation of an opinion.[26] "Pure prospectivity," even if

---

25. 26 U.S.C. § 7805(b):

"*Retroactivity of Regulations or Ruling.*—The Secretary [of the Treasury] or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."

26. The government submits that as a consequence of Article III, Section 2 of the United States Constitution, which limits the judicial power of the federal courts to adjudicating "cases" or "controversies," a federal court is without jurisdiction to overrule a prior decision and to announce a new rule of law that does not govern the decision of the case before it. At least one commentator agrees (although more on policy grounds than on strict adherence to constitutional principles). Note, "Prospective Overruling and Retroactive Application in the Federal Courts," 71 Yale L.J. 907, 930–33 (1962). Moreover, in the latest Supreme Court pronouncement on point that Court indicated a willingness to accept such a restriction on judicial alternatives:

"We recognize that Wade and Gilbert are, therefore, the only victims of pre-

trial confrontations in the absence of their counsel to have the benefit of the rules established in their cases. That they must be given that benefit is, however, an unavoidable consequence of the necessity that constitutional adjudications not stand as mere dictum. Sound policies of decision-making, rooted in the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies [citing in a footnote the Yale Note, supra], and in the possible effect upon the incentive of counsel to advance contentions requiring a change in law, militate against denying Wade and Gilbert the benefit of today's decisions." Stovall v. Denno, 1967, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206.

On the other hand, the language in *Stovall* does not take the form of an absolute constitutional proscription. And Supreme Court authority for purely prospective overruling can be found in the following quote (and the authority cited therein):

"It has been suggested that this Court is prevented by Article III from adopting the technique of purely pro-

constitutionally permissible, must be a matter of judicial grace sparingly invoked. Especially in the administrative melange of taxation, appeasement by mandating moratoria should not be readily granted. Massaglia v. Commissioner of Internal Revenue, 10 Cir. 1961, 286 F.2d 258. The Tenth Circuit, in United States v. Thomas, supra, overruled its prior holding on carried interest taxation without even mentioning the possibility of relief through purely prospective application. We can find no greater cause for such relief in the case at bar than was present in the *Thomas* case, or in Dixon v. United States, supra, or Massaglia v. Commissioner of Internal Revenue, supra.[27]

## VII.

The battle in this case is really over the right to the deduction accompanying the income during the recoupment period. The Internal Revenue Code provides premiums in the form of depreciation and depletion [28] to be awarded in connection with oil and gas operations. The same deductions cannot be taken by two parties. We here must determine which of the two is to be the beneficiary of the largesse. Our answer is the more intrepid of the two. Humble here made the essential contribution of risk capital for the enterprise. When the agreements were signed, Humble received from the Cockes the right to use the first oil produced to recoup that capital.

The argumentative justification for liberality in taxation of oil and gas is that such liberality encourages and emboldens the fiscally timid to exploit the hidden resource. It rewards the risk-taker. Here Humble risked the exploration and development costs. If tax emoluments are to be granted, it would be cynicism in the name of economic bravery to give the tax break to the economic observer.

Reversed.

## APPENDIX

### SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) *General Rule.*—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of im-

spective overruling. Note, 71 Yale L.J. 907, 933 (1962). But see 1A Moore, Federal Practice 4082–4084 (2 ed. 1961) [currently, 1 B Moore, Federal Practice 190–198 (1965)]; Currier, supra, n. 2 [Currier, "Time and Change in Judge-Made Law: Prospective Overruling," 51 Va.L.Rev. 201 (1965)], at 216–220. However, no doubt was expressed of our power under Article III in England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). See also Griffin v. Illinois, 351 U.S. 12, 20, 76 S.Ct. 585, 100 L.Ed. 891, 900 (1956) (concurring opinion of Frankfurter, J.)." Linkletter v. Walker, 1965, 381 U.S. 618, 622, 85 S.Ct. 1731, 1733, 14 L.Ed.2d 601, 604 (fn. 3).

27. Nothing said in this opinion should be construed as fettering the Commissioner in alleviating the possible harsh effects of our decision by administrative means. We merely remind the Service of its past wanderlust, a symptom from which we too have not been immune. Pursuant to our request, the Department of Justice made a computer search for pending cases where the *Abercrombie* doctrine is in question. See Judge Brown's discussion of computer aid to the judicial process in First National Bank of Birmingham v. United States, 5 Cir. 1966, 358 F.2d 625, 631–632 (concurring opinion). They reported a total of ten additional cases being pursued involving carried interest transactions, five of which involve the Cockes (subsequent years).

28. The depletion deduction was arbitrarily set. Kirby Petroleum Co. v. Commissioner of Internal Revenue, supra, 326 U.S. at 603, 66 S.Ct. at 411, 90 L.Ed. at 347. Dean Galvin, supra note 20, at 1458–1463, explains the purpose underlying depletion as "reward for risk." He adds: Percentage depletion deductions in excess of cost may be taken by owners of royalty, overriding royalty, production payment, and net-profit interests, who are not exposed to personal liability nor to cash commitments as are operators. This result, too, seems at variance with the underlying purpose of reward for risk." 73 Harvard Law Review at 1462.

provements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate.

\* \* \* \* \* \*

26 U.S.C. § 611.

SEC. 613. PERCENTAGE DEPLETION.

(a) *General Rule.*—In the case of mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

(b) *Percentage Depletion Rates.*—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

(1) 27½ percent—oil and gas wells.

\* \* \* \* \*

(c) *Definition of Gross Income from Property.*—For purposes of this section

(1) *Gross income from the property.*—The term "gross income from the property" means, in the case of a prop-

erty other than an oil or gas well, the gross income from mining.

\* \* \* \* \*

26 U.S.C. § 613.

SEC. 167. DEPRECIATION.

(a) *General Rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

\* \* \* \* \*

26 U.S.C. § 167.

SEC. 263. CAPITAL EXPENDITURES.

(a) *General Rule.*—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to—

(A) expenditures for the development of mines or deposits deductible under section 616,

(B) research and experimental expenditures deductible under section 174,

(C) soil and water conservation expenditures deductible under section 175,

(D) expenditures by farmers for fertilizer, etc., deductible under section 180, or

(E) expenditures by farmers for clearing land deductible under section 182.

(2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.

\* \* \* \* \*

*Intangible Drilling and Development Costs in the Case of Oil and Gas Wells*—Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle

corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development cost in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-Ninth Congress.

\* \* \* \* \* \*

26 U.S.C. § 263.

CLAYTON, Circuit Judge (specially concurring):

It is with reservations that I concur in my brother Goldberg's erudite funeral oration for *Abercrombie*. What we now do will limit carried and carrying parties in the exercise of unfettered rights to contract, within the law, and thus to fix, with propriety, the tax consequences of what they do, including rights to depletion. We may bring more certainty by prescribing more uniformity. Such a prescription is, perhaps, more properly legislative than judicial, since depletion originated and now exists as a matter of Congressional grace, and I am not now certain that we are doing what Congress had in mind or what the statutes require.

AINSWORTH, Circuit Judge, with whom GEWIN, GRIFFIN B. BELL and COLEMAN, Circuit Judges, join (concurring in part and dissenting in part):

I am not entirely free of doubt that we should overrule *Abercrombie*. However, I am persuaded that the able and well-reasoned opinion of the Court by Judge Goldberg presents the better view in the long-standing controversy involving proper income taxation of carried interest oil and gas transactions. The majority opinion is based more realistically on the "economic interest" principle rather than on a rigid adherence to the concept of legal title.

Obviously we should not hesitate to overrule a decisional rule which we believe to have been incorrectly decided originally. I concur, therefore, in the main portion of the majority opinion which overrules *Abercrombie,* though the principles we have promulgated today are not a panacea and it will still be nec-

essary to consider other carried interest situations on a case-by-case basis because of the great variety of arrangements that can be adopted contractually. (See T.D. 6836, 1965-2 Cum.Bull. 182; T.I.R. 749).

*Abercrombie* has withstood the combined assaults of the Internal Revenue Service, numerous law commentators, and litigants for more than 20 years. During this time Congress has not seen fit to overrule *Abercrombie* legislatively. We do not know whether the demise of the *Abercrombie* rule will be long mourned by the petroleum industry. But it is certain that those taxpayers who, in reliance on the vitality of the principle there enunciated, have entered into continuing carried interest agreements will have no cause to rejoice. We must presume that the parties entered into their carried interest contracts with knowledge of the tax consequences provided by *Abercrombie* and its progeny. Now we have reversed the *Abercrombie* rule and radically changed the tax position of parties to such transactions. To prevent manifest injustice and hardship, therefore, to those who have contracted in reliance on this rule, I would make the overruling of the *Abercrombie* principle purely prospective in its application. In the present case, the Cockes entered into their carried interest arrangements in the years 1955 and 1956—after *Abercrombie* was decided in 1947 and the Commissioner's nonacquiescence was withdrawn in 1949.

We are informed that there are ten pending cases in the Internal Revenue Service involving carried interest transactions, five of which effect the Cockes. The popularity of the carried interest agreement in the petroleum industry permits the inference that it is likely there are a large number of such contracts in existence which will now be affected by our decision.

Prospective overruling is not an unknown legal principle. Cardozo first popularized it in Great Northern Ry. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360

(1932), though as early as 1848 the Ohio Supreme Court in declaring legislative divorces invalid confined the effect of its ruling to the future. See Bingham v. Miller, 17 Ohio 445. A judicial decision overruling a former principle of law may properly be made purely prospective in its application, as is pointed out in the exhaustive treatise by Justice Schaefer of the Illinois Supreme Court entitled "The Control of 'Sunbursts': Techniques of Prospective Overruling," 22 Record of N.Y.C.B.A. June 1967, 1–29; see also Traynor, "The Well-Tempered Judicial Decision," 21 Ark.L.Rev. 287 (1967). Purely prospective application was referred to with approval by the Supreme Court in Linkletter v. Walker, 381 U.S. 618, 622, 85 S.Ct. 1731, 1733, f. 3 (1965), affirming the Fifth Circuit decision in United States v. Walker, 5 Cir., 1963, 323 F.2d 11. See also England v. Louisiana State Bd. of Med. Exam., 375 U.S. 411, 84 S.Ct. 461 (1964). As the majority observes, the later case of Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967 (1967), is not "an absolute constitutional proscription" to purely prospective overruling.

I, therefore, dissent from that part of the majority opinion which gives full retrospective effect to our decision and fails to provide only purely prospective application.

Rehearing denied; CLAYTON, Circuit Judge, not participating due to illness.