NATIONAL OIL COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
National Oil Co. v. Commissioner
Docket No. 28073-81.
United States Tax Court
T.C. Memo 1986-596; 1986 Tax Ct. Memo LEXIS 8; 52 T.C.M. (CCH) 1223; T.C.M. (RIA) 86596; December 23, 1986. *8 Held: Petitioner did not receive capital interests in partnerships in exchange for services during the taxable year; held further, gain on the sale of interests in oil and gas leases is recharacterized as ordinary income. Thomas C. Triplett, for the petitioner. Mark H. Howard, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined a deficiency in petitioner's income tax in the amount of $144,348.49 for the calendar year ended December 31, 1977. After concessions the issues for decision are: (1) Whether during the year 1977 petitioner received in exchange for services a capital interest in the limited partnership known as National Oil Program (NOP-77), and if so, what is the value of said interest; (2) if petitioner received a capital interest in NOP-77, whether petitioner is entitled to deduct a proportionate share of drilling costs for the year 1977; (3) whether during the year 1977 petitioner received in exchange for services a capital interest in the partnership identified as MCC 7-A, and if so, what is the value of said interest; (4) if petitioner received a capital interest in MCC 7-A whether petitioner is entitled to deduct *9 a proportionate share of drilling costs for the year 1977; (5) whether fractional undivided interests in undeveloped oil and gas leases sold by petitioner to NOP-77 and other investors were properties used in petitioner's trade or business or properties held for sale in the ordinary course of petitioner's business; and (6) whether the tax benefit rule applies to the sale by petitioner of oil and gas leases at a value equal to petitioner's actual cost plus an allocation of the applicable indirect costs to cause petitioner to recognize gain as ordinary income. FINDINGS OF FACT Petitioner, National Oil Company (National), is a Kansas corporation. National's principal business during the year 1977 and prior thereto was oil and gas exploration, development, and production. At the time the petition in this case was filed, National's principal place of business was in Colorado. In the conduct of its business, National acquired oil and gas leases and other mineral rights which it believed were suitable for exploration and drilling. To fund the costs of drilling the prospects it acquired, National formed limited partnerships and sold undivided interests in the oil and gas properties to the *10 partnerships. In addition, National sold undivided interests in oil and gas properties directly to third parties. NOP-77
In 1977, National formed the Kansas limited partnership NOP-77. The limited partnership agreement (The Agreement) became effective in December 1977. [1] Subscriptions in NOP-77 were sold through Paine, Webber, Jackson & Curtis, Incorporated, as selling agent. Interests were offered at a unit price of $150,000 each with a minimum interest of one-third unit. The NOP-77 Confidential Private Placement Memorandum provided that the selling agent was to receive a commission of 6 percent of the total subscription plus an expense allowance. The commissions, expense allowance, and costs of the offering were to be deducted from the limited partner subscriptions prior to the formation of NOP-77. Pursuant to Federal and state securities laws National disclosed *11 in the private placement memorandum all direct and indirect compensation to be received from the formation and organization of NOP-77. Set forth in the private placement memorandum were the following paragraphs relating to compensation. At page 5: National and Simmons-Taylor will receive compensation by reason of the fact that they are to receive collectively 25% of the Partnership income and bear none of the lease acquisition costs and none of the Drilling Costs of each Test Well. In addition, National will be transferring leasehold interests to the Partnership at a value equal to the actual costs of said leases to National and an allocation of the applicable indirect costs. In those cases where National is an operator of a Partnership Property, National will receive a per-well fee as operator for drilling and for producing wells at the rates set forth in the Accounting Procedure, Exhibit "C" hereto. At page 26: National and Simmons-Taylor will receive compensation by reason of the fact they are collectively to receive 25% of the Partnership income and bear none of the leasehold acquisition costs and none of the Drilling Costs of each Test Well. All other costs will be borne in *12 the same proportion in which partners share in Partnership revenues. Interests in leases within Prospects will be transferred by National to the Partnership at a value equivalent to the actual costs of said leases and a pro rata allocation of applicable indirect costs incurred since the formation of National's previous drilling program (April, 1977) until the formation of the Partnership. The proportion of these indirect costs to be borne by the Limited Partnership will depend on the percentage of Prospects transferred to the Limited Partnership. In those cases where National is an operator of a Partnership property, National will receive, as operator for drilling and for producing wells, fees at the rates set forth in the Accounting Procedure, Exhibit C. NOP-77 was formed with 34 limited partners and 3 general partners. The Agreement provides that National, the managing general partner, will receive 18.75 percent of the profits, making no initial capital contribution, but having the obligation to make capital contributions to NOP-77 to pay 18.75 percent of the completion costs of test wells and drilling and completion costs of subsequent wells. [2] *14 NOP-77 also had two nonmanaging general *13 partners. One was Simmons-Taylor, a general partnership composed of James J. Simmons, president and sole stockholder of National, and Larry L. Taylor, an employee of National. The other was James J. Simmons individually. Simmons-Taylor also was to have a 6.25 percent share of the profits and was not required to make an initial capital contribution. However, Simmons-Taylor was required to pay 6.25 percent of the completion costs of test wells and the drilling and completion costs of subsequent wells. James J. Simmons received a .75 percent interest in the profits, and made a capital contribution of $19,293. [3] *15 The limited partners collectively received 74.25 percent of the interest in partnership profits after paying total subscriptions of $1,960,000. The following table summarizes the sharing of revenues and expenses among the NOP-77 limited and general partners, pursuant to The Agreement: Limited
Simmons-
Partners
Simmons
National
Taylor
Revenues
74.25%
.75%
18.75%
6.25%
Lease acquisition
costs
99.00%
1.00%
All drilling cost
of test wells
99.00%
1.00%
Completion costs
of test wells
74.25%
.75%
18.75%
6.25%
Drilling and com-
pletion of all
74.25%
.75%
18.75%
6.25%
subsequent wells
Operating Costs
74.25%
.75%
18.75%
6.25%
All contributions by the limited partners were credited to the capital accounts of the limited partners. The Agreement specified that such contributions should be deposited in a separate bank account. Any interest earned on the contributions of capital was allocated to the limited partners. All costs and expenses of the partnership were allocated in the same percentage as revenues were allocated, except lease acquisition costs and drilling costs of test wells which were allocated 99 percent to the limited partners and 1 percent to Simmons. Revenues *16 from the sale of leases that had not been drilled would be allocated to the partners who paid the costs with respect to said leasehold interests, i.e., the limited partners. The Agreement also provided that all deductions and credits including intangible drilling and development costs would be allocated to the partners who were charged with the expenditure giving rise to such deduction. The recapture of intangible drilling and development costs would be allocated to the partners entitled to such deductions. In the event of dissolution of the partnership, The Agreement provided as follows: (b) * * * the Managing General Partner shall wind up the affairs of the Partnership, shall make provision for the payment of Partnership debts and liabilities, and shall distribute to the Partners an undivided interest in the Partnership Properties and the other assets of the Partnership in accordance with their respective interests in the revenues, plus or minus any adjustments (whether in money or in property with value equal thereto) necessary to take into account such Partners' proportionate interests in the accrued liabilities of the Partnership, and all debits and credits to or withdrawals *17 from such Partners' capital accounts. Upon distribution of Partnership assets, the Partnership shall terminate. All Partners shall look solely to the assets of the Partnership for the payment of their interests in the Partnership, and no Partner shall have recourse against the personal assets of any other Partner for this purpose absent fraud, gross negligence or willful and wanton conduct. [4]
Upon the formation of NOP-77 the partnership's assets consisted solely of cash obtained from capital contributions by the limited partners and Simmons. During 1977, following formation, the partnership purchased from National a 66.7081 percent interest in certain oil and gas leases for the sum of $292,532. The purchase price represented the proportionate actual cost of the leases to National plus an allocation portion of indirect cost accrued by National. [5] *18 In the Federal partnership income tax return filed for NOP-77 for the year ended December 31, 1977, the partnership claimed a deduction for intangible drilling costs in the amount of $1,114,006.21, which was allocated $1,102,866.15 to the limited partners and $11,140.06 to Simmons. The return also reported $9,651.39 of interest income which was allocated entirely to the limited partners. These drilling costs were charged to the capital accounts of the limited partners and Simmons, and the interest was credited to the limited partners' capital accounts. Howard Wilkins and Hansen Trust, et al.
During 1977, National also acquired investment funds through the sale of undivided interests in oil and gas leases directly to Canevari Timber Co., Inc., C. Howard Wilkins, Jr., and D. G. Hansen Trust. Together these three parties obtained a 21.875 percent interest in 25 separate prospects, most of which were the same prospects in which NOP-77 had purchased its interest from National. The purchase agreements between *19 National, Canevari, Wilkins, and Hansen Trust were uniform; each provided that National was to be paid a specific sum for services such as selection of the drill site and negotiation of the drilling contracts. The contracts also provided that National would arrange for the drilling of a test well on each prospect and that each purchaser would pay a percentage of the total drilling cost to casing point of the test well equal to 133 percent of the purchaser's undivided interest in the prospects. For all costs incurred after the casing point was reached on the test well drilled on any given prospect, the purchaser was to pay the same percentage of cost as was held by the purchaser in the individual prospect. The parties agreed that their arrangement created a partnership for Federal tax purposes, and for the year ended 1977, a Federal partnership return was filed under the name Howard Wilkins and Hansen Trust, et al., Partnership. The partners and their respective interests were reported as follows: Percentage
Partner
Interest
(1) NOP-77
66.7081
(2) Hansen Trust
12.5   (3) Howard Wilkins
6.25  (4) Robert E. Canevari
3.125 (5) James J. Simmons
1.0403
(6) Larry L. Taylor
1.0403
(7) National Oil Company * *20 9.3363
(8) National Oil Ohio **
2.3924 For the year ended December 31, 1977, the partnership return showed a loss of $1,113,139 which was allocated solely to NOP-77. [6] The entire loss represents a deduction in the same amount for intangible drilling costs. MCC 7-A
In addition to the two partnerships involving NOP-77, National acquired investment funds through the sale of undivided interests in oil and gas leases to 23 separate investors in 1977. Each investor signed a uniform contract which contained a provision wherein the parties acknowledged that the agreement created a partnership for United States income tax purposes. National referred to the 23 separate investors as Mid-Continental Co. 7-A or MCC 7-A in its corporate records. A partnership *21 return was filed for the investors for the year 1977 under the name of John Poos and John Zimmerman, et al., Partnership. Each investor agreed to pay a percentage of the total drilling costs to casing point of the test wells in an amount equal to 133 percent of the investor's interest in the oil and gas leases. All costs occurring after reaching the casing point of the first test well were to be paid in accordance with the investor's interest in the leases if the investor elected to participate in the completion of said well. For purposes of the partnership income tax returns required to be filed, the parties agreed: * * * that to the extent permitted by law, all deductions and credits, including, but not limited to, intangible drilling and development costs, depreciation, rental expenses and the investment tax credit where applicable shall be allocated to the partner who has been charged with the expenditure giving rise to such deductions and credits, and to the extent permitted by law, such parties shall be entitled to such deductions and credits in computing taxable income or tax liabilities to the exclusion of any other party; provided, however, that allowable depletion to the *22 extent of the adjusted tax basis of the property giving rise to such depletion shall be allocated to the party who has been charged with the expenditure giving rise to such basis and depletion in excess of the adjusted tax basis of the property shall be allocated in the ratio in which revenues are shared. Transfers of Undivided Interests in Oil and Gas Leases
National sold undivided interests in various oil and gas leases during the calendar year 1977. On its schedule of gains and losses for the year 1977, National reported part of the gain from the sale of the oil and gas leases as gain from the sale of property used in trade or business, and part of the gain as ordinary income. [7] *23 National provided no explanation of the difference in treatment of the leases, and also failed to identify which leases were included in the two sale groups. In the notice of deficiency respondent recharacterized the gain reported from the sale of property used in trade or business as ordinary income from the sale of property held for sale in the ordinary course of National's business. Statutory Notice of Deficiency
Respondent issued National a statutory notice of deficiency on August 20, 1981, for the taxable years 1974, 1976, and 1977. National did not challenge the adjustments for 1974 and 1976. For the year 1977, National contests respondent's determination that capital interests in NOP-77 and MCC 7-A were received and that gain reported in the amount of $41,724.11 from the sale of oil and gas leases should be recharacterized as ordinary income. In the original statutory notice, respondent determined that National's amount of taxable income for the tax year ended 1977 attributable to capital interests in NOP and MCC 7-A was $450,704.26 and $61,316.66, [8] respectively. Prior to trial respondent conceded to a decrease in the original adjustment with respect to the alleged capital interest in NOP-77. The revised adjustment in issue from Schedule *24 A of the statutory notice measured the value of the capital interest respondent determined was transferred as $244,845, a value equal to 18.75 percent of the leasehold and intangible drilling costs paid by NOP-77. National claims that the errors and inconsistencies in the statutory notice of deficiency which led to respondent's concessions have destroyed the presumption of correctness the notice carries. As a result, National contends, the burden of going forward with the evidence to prove additional income with respect to the capital interests should be placed on respondent. OPINION Initially we must address National's argument with respect to respondent's burden of proof. Respondent's notice of deficiency carries a presumption of correctness and except as otherwise provided by statute or determined by the Court, petitioner bears the burden of proving that the determination is incorrect. Rule 142(a). [9] The *25 presumption in favor of respondent's notice may fail and the burden of going forward with the evidence may shift to respondent under certain circumstances. See, e.g., Helvering v. Taylor,293 U.S. 507 (1935); Llorente v. Commissioner,74 T.C. 260 (1980), especially, "Tannenwald J." concurring, 74 T.C. at 272-280, revd. in part 648 F.2d 152 (2d Cir. 1981). In this case we see no reason to invalidate respondent's determination on the basis that respondent conceded to a reduction in the deficiency. Respondent made concessions in light of information obtained during preparation for trial. To charge respondent, as a consequence of such concessions, with the burden of going forward with the evidence to prove any amounts not conceded, would discourage respondent from settling issues on the basis of information obtained in discovery. Turning to the pivotal issue in this case, we must decide whether National was the recipient of capital interests in the partnerships known as NOP-77 and MCC 7-A. Respondent *26 on brief has requested that we find as ultimate facts that the limited partners in NOP-77 and the investors in MCC 7-A transferred a portion of their capital to National in exchange for National's services in organizing and assisting with the formation of the partnerships, and that the value of National's capital interests equals at least the portion of leasehold costs and intangible drilling costs of test wells attributable to National's interest in the partnerships but paid by the limited partners or the investors. [10]
Relying on section 1.721-1(b)(1), Income Tax Regs., [11] *28 and the language in the NOP-77 private placement memorandum regarding compensation, respondent argues that once the partnership expended a portion of the initial capital contributions on leasehold and intangible drilling costs, then that capital could not be returned to the limited partners or investors. Because the limited partners gave up their right to a return of the expended *27 capital, respondent reasons that the capital was transferred to National, at least to the extent National received an economic benefit from the arrangement. Respondent argues further that National benefited by being able to wait until after test wells were drilled and data was available on the commercial potential of the test wells before incurring its proportionate costs on those wells. In contrast, National claims that the only interest it received in NOP-77 was an 18.75 percent interest in future profits, which interest respondent has already conceded is not taxable in 1977. [12] *29 Contending that the limited partners' capital was not transferred and that no capital interest was so received, National argues that even though the limited partners cannot be repaid that portion of their capital that was expended by the partnership for leasehold and test well costs, National did not benefit from the capital. With respect to MCC 7-A National argues that the interest was what is known in the industry as a "carried interest," which National contends is not taxable upon receipt. [13] If National received a capital interest in either partnership then the fair market value of such interest is includable in income as compensation. Sec. 61(a); secs. 1.61-2(a)(1), 1.721-1(b)(1), Income Tax Regs. However, for the reasons stated below, *30 we hold that National did not receive such an interest. In each partnership the investors' initial capital contributions were used by the partnership for leasehold and test well drilling costs and once used the capital could not be returned to the investors. Yet National received no economic benefit resulting from this arrangement. Unless the test wells became producing wells National received nothing from the partnerships. National did not acquire the right to be paid any of the initial capital contributions if the partnerships were liquidated. [14] *31 If the test wells were producers, National was required to pay its share of completion costs. Further, if the parties decided to drill subsequent wells, National would be obligated to contribute its share of capital. We see no taxable economic benefit or advantage in National's not having to make initial contributions to the partnerships. While the investors have borne the risks involved in drilling the test wells, those investors also received the corresponding tax advantages. National cannot be said to benefit economically merely because the investors risked their investment and National did not. Respondent's reliance on cases in which courts have addressed the receipt of partnership interests for services is misplaced. See, e.g., United States v. Frazell,335 F.2d 487 (5th Cir. 1964); Diamond v. Commissioner,56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974);. In each of those cases the issue was whether an interest or property received for services rendered was taxable. In our case we do not reach this issue because we hold that National never received a capital interest in exchange for services. [15] *32 *33 Since we hold that National did not receive capital interests in either NOP-77 or MCC 7-A, the only issues remaining for decision pertain to the proper tax treatment of gain reported from National's sale of interests in various oil and gas leases. In 1977 National reported gain in the amount of $41,724.11 from the sale of interests in various oil and gas leases as capital gain. In the notice of deficiency respondent determined that this amount should have been reported as ordinary income from the sale of property held for sale in the ordinary *34 course of National's business. Although both parties addressed the issue of whether National sold the interests in lesses in the ordinary course of its business, or whether the leases constituted property used in its trade or business, we cannot decide this issue without first knowing which leases were reported under the trade or business property sale group and received capital gains treatment. [16] *35 Neither party has indicated which leases were the subject of such sales. Since National bears the burden of proof on this issue and has not satisfied this burden, we are bound by the presumption of correctness which attaches to respondent's deficiency determination. We therefore hold that the gain of $41,724.11 should be recharacterized as ordinary income and reported as gain from the sale of property held in the ordinary course of National's business. [17]
Decision will be entered under Rule 155.
Footnotes
1. The stipulation includes a copy of the Certificate of Formation of Limited Partnership which includes a certificate issued by the Kansas Secretary of State dated December 1, 1977. A copy of the executed limited partnership agreement is not included in the record. We assume the effective date is the date of the certificate.↩
2. The Agreement provides the following definitions: Test Well -- The initial well drilled by the Partnership on a Prospect to certain target formations. Subsequent Well -- A well drilled by the Partnership on a Prospect after completion of the Test Well either as a producer or a dry hole. Prospect -- Oil and gas leases or other rights in a defined geographical area believed to lie on a geologic structure or stratigraphic trap as fixed or determined by National. Drilling Costs -- All costs incurred in the drilling of a well to the Casing Point. Such costs include costs connected with the location and preparation of wellsites, footage and day-work drilling costs, drillstem tests and core analyses and plugging and abandonment costs if no completion operations are commenced. Casing Point -- That point at which the well has been drilled to its objective depth, tested, logged and evaluated, i.e., that point in time prior to commencement of production casing operations in an attempt to complete the well for production. Completion Costs↩ -- Those expenditures beginning at Casing Point and including, but not limited to, production casing, cement and cementing services, tubing, packers, perforation, swabbing, treating and all other such expenditures. Also included are the costs of tank batteries, treating facilities, flow lines, and other costs relating to preparing the well and completing for production and plugging and abandonment if production casing operations have been conducted. 3. The limited partnership agreement required Simmons to make a capital contribution equal to 1/99 of the total initial capital contribution of the limited partners. We note that the partnership return for NOP-77 for the year 1977 indicates that Simmons contributed $18,032 capital during the year. No explanation of this discrepancy was offered.
4. Petitioner contends that pursuant to this provision distributions in liquidation are made in accordance with revenues only after making adjustments to take into account partners' proportionate capital accounts.↩
5. On its Federal corporate income tax return for the year 1977, National reported gain from the sale of various oil and gas leases both as gain from the sale of property used in a trade or business and as ordinary income. It is not clear from the return in which category National included the sale to NOP-77.
*. Interest in Tonn Lease of 6.9439% ** Interest in Tonn Lease only.↩
6. There is a slight discrepancy between the loss of $1,113,139 shown on this partnership return and the deduction claimed by NOP-77 in the amount of $1,114,006.21, but the amount is immaterial. It also appears that National was not required to pay its pro rata costs of drilling the test wells vis-a-vis the other partners in this informal partnership. However, for 1977 the entire cost was allocated to NOP-77 for unknown reasons.↩
7. National reported $138,207.18 as the gross sales price of various oil and gas leases used in trade or business, and arrived at a gain of $41,724.11 after recovery of cost basis of $46,483.07. The addition, National reported $575,688 as the gross sales price of oil and gas leases not held 12 months. After basis recovery of $331,269.89, National's gain on the sale of said leases was $244,418.11. This gain was reported as ordinary income.
8. In accordance with the agreement of the parties and the ruling of the Court, the trial record in this case remained open for 30 days after trial, during which time respondent conceded a decrease in adjustment reflecting the value of the MCC 7-A capital interest to $31,548.58.↩
9. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
10. We note that this request is somewhat inconsistent with respondent's initial position in the statutory notice that petitioner had received capital interests equal to the amount of capital that investors allegedly gave up in favor of National.↩
11. Sec. 1.721-1(b)(1)
Normally, under local law, each partner is entitled to be repaid his contributions of money or other property to the partnership (at the value placed upon such property by the partnership at the time of the contribution) whether made at the formation of the partnership or subsequent thereto. To the extent that any of the partners gives up any part of his right to be repaid his contributions (as distinguished from a share in partnership profits) in favor of another partner as compensation for services (or in satisfaction of an obligation), section 721 does not apply. The value of an interest in such partnership capital so transferred to a partner as compensation for services constitutes income to the partner under section 61. The amount of such income is the fair market value of the interest in capital so transferred, either at the time the transfer is made for past services, or at the time the services have been rendered where the transfer is conditioned on the completion of the transferee's future services. * * * [Emphasis supplied.]
12. See, e.g., Hale v. Commissioner,T.C. Memo. 1965-274, 24 T.C.M. 1497, 1502, 34 P-H Memo. T.C. par. 65,274 at 1646-65; G.C.M. 36346 (1975); Willis, Partnership Taxation, sec. 27.02 (3d Ed., 1982); cf. Diamond v. Commissioner,56 T.C. 530 (1971), affd. 492 F.2d 286↩ (7th Cir. 1974). 13. National relies on G.C.M. 22730, 1941-1 C.B. 214, in support of the position that a "carried interest" is not taxable upon receipt. Respondent argues that the term "carried interest" is not applicable to National's interest in MCC 7-A because the investors in MCC 7-A agreed to be treated as a partnership for Federal tax purposes. "Carried interests" refer to sharing arrangements where one of the owners of the working interest in property is willing to advance the funds necessary for drilling of wells and development of production of oil and gas, and to look only to the other owner's share of production for the owner's contribution to such costs. The person who puts up this money is called the carrying party because he risks his entire investment against the possibility that there will not be enough production to reimburse him his costs. United States v. Cocke, et al.,399 F.2d 433↩ (5th Cir. 1968).
14. Respondent argues that in the normal course of business NOP-77 would deplete the capital accounts and then the assets of NOP-77 would be distributed on dissolution in conformance with the revenue interests without need to consider capital accounts. We find no support in the record for this argument. Although the NOP-77 partnership agreement provides that on liquidation distributions will be made in accordance with each partner's revenue interest, such distributions occur only after the partners' capital accounts are taken into account. Thus, none of the limited partners' initial capital is transferrable to National.
15. The issue in Diamond v. Commissioner,56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974), was whether the revenue interest received by the taxpayer in exchange for services was susceptible to taxation. The present case involves whether National received a capital interest from the other limited partners, not a revenue interest, and respondent has already conceded that National's profits interest was not taxable in 1977. In United States v. Frazell,335 F.2d 487 (5th Cir. 1964) the issue was whether the taxpayer was taxable upon the formation of a corporation. The taxpayer, a geologist, entered into a contract with two other parties pursuant to which he was to evaluate potentially productive oil and gas properties and recommend acquisitions. In return he received monthly salary expenses. He was also to receive an interest in the properties after the other two parties recovered their full costs and expenses. When the arrangement proved successful, the parties decided to form a corporation. The employment contract was terminated and the oil and gas properties were transferred to the corporation. The taxpayer claimed that he contributed his interest in the oil and gas properties to the corporation and was not taxable under section 351(a). The Fifth Circuit held that the transaction could be viewed two ways, but in either event, the taxpayer was to be treated as receiving compensation taxable as ordinary income. The Court held that the taxpayer either received a partnership interest which became possessory when the employment contract was terminated and was taxable at that time, or that the taxpayer received stock in lieu of the partnership interest and was taxable on the receipt of stock for services. The present case does not involve whether property received is taxable as compensation for services. Instead it involves whether any capital interest was received at all. Therefore, Frazell↩ does not apply.
16. We assume that both parties originally attributed the gain to National's sale of the interest in leases to NOP-77, since the parties stipulated that the gain from the sale of leases to NOP-77 was reported as capital gain. However, respondent noted on brief that the gain that was actually reported as capital gain on National's return may or may not have been from the sale to NOP-77 since the amount realized from the NOP-77 sale was $292,532, an amount greater than that reported as realized from the sale of interests in leases used in the trade or business. 17. Since we have held that the gain is ordinary income, we do not need to address the final issue in this case of whether the tax benefit rule would apply to petitioner's sales at a value equal to actual cost plus an allocation of applicable indirect costs to cause National to include as ordinary income an amount equal to those costs recovered on the sale which were previously deducted.↩